[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 18-14606

————————————————

D.C. Docket No. 1:16-cv-03924-MHC

KENDRA MUNOZ,

Plaintiff - Appellant,

versus

SELIG ENTERPRISES, INC.,

Defendant - Appellee.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia

————————————————

(December 4, 2020)

Before MARTIN, NEWSOM, and JULIE CARNES, Circuit Judges.

MARTIN, Circuit Judge:

This is Kendra Munoz's appeal of the District Court's grant of summary

judgment to her former employer, Selig Enterprises, Inc. ("Selig"), on her claims

under the Americans with Disabilities Act ("ADA") and the Family and Medical

Leave Act ("FMLA"). After careful consideration, and with the benefit of oral argument, we reverse the grant of summary judgment on Ms. Munoz's claim of retaliation under the FMLA. We otherwise affirm.

**I.**

From 2005 to 2013, Ms. Munoz was an executive leasing assistant at Selig, which is a real estate management company. She provided administrative assistance to two vice presidents at Selig, Kent Walker and Jim Saine. She received raises and bonuses from Selig every year.

In January 2010, Ms. Munoz was disciplined for tardiness. She discussed this issue with Mr. Saine and Mr. Walker, completed team counseling, and signed a performance memorandum indicating her willingness to become more of a "team player" and arrive to work on time.

Then in 2011, Ms. Munoz began experiencing chronic health issues. She was eventually diagnosed with uterine fibroids, ovarian cysts, and endometriosis. She testified that, once in January 2012 and again twice in November 2012, she told Mr. Saine and Mr. Walker she may have uterine fibroids. She claims that she asked to be accommodated for intermittent lateness, early departure, or full-day absences as dictated by her condition and doctor's appointments. But Mr. Saine said Ms. Munoz never gave these notifications or requests. Later, in February 2013, Ms. Munoz told Mr. Saine and Mr. Walker she needed time off for

2

exploratory surgery, and they granted her time off.  Ms. Munoz alleges she then told them on April 30, 2013, that she had been diagnosed with endometriosis and that she would immediately begin treatment.  Yet again, Mr. Saine and Mr. Walker testified to the contrary, saying they never learned of Ms. Munoz's diagnosis or treatment.  It is undisputed that Selig never provided Ms. Munoz with FMLA certification paperwork or advised her of her right to request accommodations for health conditions.

Ms. Munoz did send emails to Mr. Saine and Mr. Walker during 2011 to 2013 asking for permission to be late or absent generally because of illness and doctor's appointments.[1]  One email from October 2012 said, "I'm sorry but I will not make it into the office today.  I live with pain everyday and I just can't push past it today—just can't."  A few months later, Ms. Munoz wrote, "Terrible weekend—in bed sick the entire 2 days.  My pain meds make me dizzy so I can[']t drive right now."  In March 2013, Ms. Munoz described that it was "just too hard" in the morning and she was "sick almost every day."  And two months later, she emailed that she felt "completely immobilized" and could not "[p]hysically . . . make it in today."  On another occasion, Ms. Munoz's endometriosis caused her to

---

[1] Ms. Munoz never submitted any medical notes about her conditions, but the parties agree she was not required to submit medical notes in order to receive paid time off.

3

"have an accident and soil [her] clothing" while she was driving to work and she had to turn around and go home before coming into the office.

According to Ms. Munoz, Selig was less than accepting of her need for medical leave. One day when Ms. Munoz was tardy for health reasons—and emailed to let Selig know she was sick— Mr. Saine remarked, "Oh, look what the cat drug in," when she arrived at the office. Mr. Walker also testified that he probably referred to Ms. Munoz's health conditions at some point during her employment as "female issues" or a "female problem."

Mr. Saine and Mr. Walker deny that they grew frustrated with Ms. Munoz's medical leave. Instead, they say Ms. Munoz's work performance suffered around the same time that her health deteriorated. Both supervisors testified they lost patience with Ms. Munoz in April 2013 after a particularly frustrating email exchange. By email, Ms. Munoz told Mr. Saine and a Selig client that Saine was handling a certain work task himself. Mr. Saine insisted he had asked Ms. Munoz to take care of it. Ms. Munoz responded, "Nope—you didn't—at any rate, I WILL take care of it now. It's back on my desk—to my surprise and I'll handle it. No worries. :-D" Mr. Saine forwarded the email to Mr. Walker, saying, "This attitude is very upsetting."

Mr. Saine also testified that he saw Ms. Munoz working on personal tasks during work hours. On May 5, 2013, he downloaded a computer program that

4

allowed him to view Ms. Munoz's computer activities in real time from his own computer.  Overall, Mr. Saine observed Ms. Munoz was off task on nine days in May and on three days in June.

All told, Ms. Munoz was tardy 72 days in 2009, 53 days in 2010, 23 days in 2011, 75 days in 2012, and 32 days between January and May 2013.  Ms. Munoz testified that the occasions of her tardiness related to chronic illness outnumbered those unrelated to her health.  Nevertheless, Mr. Saine and Mr. Walker believed the majority of Ms. Munoz's tardies were for non-health related reasons.

On May 22, 2013, Mr. Saine and Mr. Walker prepared a memorandum on Ms. Munoz's performance (the "Performance Memo" or "Memo"), along with Selig CFO Ron Stein, who oversaw Selig's human resources matters.  The Performance Memo listed concerns like Ms. Munoz's defensiveness, excessive tardiness, failure to seek consent before changing her work hours, failure to adequately give notice when taking extended paid time off, excessive amount of the day working on personal affairs, and causing a difficult work environment.

On June 6, 2013, Mr. Saine and Mr. Walker met with Ms. Munoz to review these concerns.  Ms. Munoz testified that their discussion touched on many things, including Mr. Saine and Mr. Walker's concern that she had not given them enough notice about taking off for spring break.  But according to Ms. Munoz, the "common thread" of their criticism was "You've been out" and "You've been

5

late." She said Mr. Saine and Mr. Walker told her, "You're going to have to square this up. You're not going to be able to be late. You're not going to be able to be out." They then asked Ms. Munoz to sign the Performance Memo to acknowledge its receipt. The Memo stated that "failure to make the necessary changes will lead to further discipline, up to and including termination of [Ms. Munoz's] employment." Ms. Munoz says she told Mr. Saine and Mr. Walker that she would not sign the Memo because her endometriosis would still occasionally require her to miss and be late for work. She asserted,

> I'm not signing this [Performance Memo] guys because
> . . . this goes against everything that I am doing here. I
> have endometriosis, how, how can I not be out anymore,
> how can I effectively remedy this situation when I have a
> chronic illness and you already know I'm going to be late
> and you know I've been late because of it.

According to Ms. Munoz, Mr. Saine then responded, "Oh nobody's sick that long. You've been sick for over a year. Who's sick that long; over a year you've been sick?" Ms. Munoz says she was fired shortly after.

For their part, Mr. Saine and Mr. Walker say Ms. Munoz did not refuse to sign the Memo on account of her health conditions. Mr. Saine says Ms. Munoz did not offer any health reason for declining to sign, and Mr. Walker says she never brought up her endometriosis at all during the meeting. Mr. Saine acknowledged that when Ms. Munoz otherwise brought up her health conditions as a reason for

6

her attendance issues, he told her that "no one is sick that long." But he maintained this exchange happened after Ms. Munoz had been fired.

## II.

In December 2013, following her termination, Ms. Munoz filed a charge of discrimination with the Equal Employment Opportunity Commission. She then filed suit in federal court in October 2016, making several statutory claims. She alleged Selig discriminated against her under the ADA, 42 U.S.C. § 12101 et seq., by failing to accommodate her disability and firing her because she was disabled. She also alleged that Selig interfered with her rights and retaliated against her under the FMLA, 29 U.S.C. § 2601 et seq., by failing to notify her of her FMLA rights and firing her for intending to use leave allowed by the FMLA. Selig answered the complaint and denied liability.

After the close of discovery, Selig moved for summary judgment on all claims. A magistrate judge recommended granting Selig's motion. The magistrate judge found that Ms. Munoz was not disabled within the meaning of the ADA because she "provided no evidence of the limiting effects of her health condition beyond her own declaration and deposition testimony." The magistrate judge also found that Selig never denied Ms. Munoz any accommodations and that Selig fired her for reasons unrelated to her medical conditions, namely "insubordination" and "defensiveness."

With respect to Ms. Munoz's FMLA claims of interference and retaliation, the magistrate judge decided Selig did not willfully violate the FMLA, and thus he rejected Munoz's claims. The magistrate judge also found that Ms. Munoz suffered no damages from any violations of her FMLA rights. The magistrate judge further decided that Ms. Munoz was terminated for non-health-related tardiness, rather than for FMLA-qualifying absences and tardiness. Finally, the magistrate judge found that Selig did not retaliate against Ms. Munoz in violation of the FMLA, because she failed to give sufficient notice of the timing or duration of her health-related leave, such that her request for leave was not statutorily protected activity. The magistrate judge also said that Ms. Munoz's refusal to sign the Performance Memo was not protected activity because it was "objectively unreasonable" for her to believe that agreeing to the Memo would eliminate her FMLA rights. Thus, the magistrate judge found no causal connection between Ms. Munoz's requests for leave or refusal to sign the Performance Memo and her termination.

Ms. Munoz objected to the magistrate judge's recommendations, arguing, among other things, that Mr. Saine's comment that "nobody's sick that long" was evidence of discriminatory and retaliatory intent. She also objected to the analysis of her other performance issues (being insubordinate, defensive, and off-task)

8

because she said it was undisputed "that she was terminated for refusing to sign" the Performance Memo after objecting to the attendance requirements.

The District Court overruled Ms. Munoz's objections and adopted the recommendations of the magistrate judge, granting summary judgment to Selig. Ms. Munoz timely appealed.

## III.

We review <u>de novo</u> a district court's grant of summary judgment. <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). We view the evidence and draw all reasonable inferences in favor of Ms. Munoz, the party opposing summary judgment. <u>See</u> <u>id.</u>

## IV.

We consider Ms. Munoz's ADA claims first, then turn to her FMLA claims.

### A.

The ADA protects an employee who (1) has a disability; (2) can perform the essential functions of her job with or without reasonable accommodations; and (3) is subjected to unlawful discrimination because of her disability. <u>See</u> <u>Mazzeo v. Color Resolutions Int'l, LLC</u>, 746 F.3d 1264, 1267–68 (11th Cir. 2014). The District Court granted summary judgment on Ms. Munoz's ADA claims because she had not proven she was disabled within the meaning of the statute. We agree

9

that Ms. Munoz did not introduce sufficient evidence that she was disabled under the ADA.

The ADA considers an employee disabled if she has an impairment that substantially limits a major life activity. Rossbach v. City of Miami, 371 F.3d 1354, 1357 (11th Cir. 2004) (per curiam). Major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). The ADA also defines major life activities to include "the operation of a major bodily function, including . . . endocrine[] and reproductive organs." Id. § 12102(2)(B). To qualify as disabled under the ADA, the employee must be substantially limited in a major life activity "as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).

Ms. Munoz argues that she had an ADA-qualifying disability because she was ill from 2011 to 2017 with ovarian cysts, uterine fibroids, and endometriosis. She relies on her own testimony that she suffered "extreme pain, exhaustion, sleep interruption, and lack of bodily function control." She says these ailments substantially limited her ability to sleep, work, and reproduce.

The record does include evidence that Ms. Munoz's health was impaired. But, despite this, we cannot conclude that Ms. Munoz's impairments substantially

10

limited her ability to sleep, work, and reproduce. This is because the record does not contain evidence of the timing, frequency, and duration of Ms. Munoz's impairments. Without this evidence, we cannot assess whether Ms. Munoz meets the definition of disabled under the ADA.

Our Court rejected a claim similar to Ms. Munoz's in Lewis v. City of Union City, 934 F.3d 1169 (11th Cir. 2019). In that case, Jacqueline Lewis asserted disability under the ADA because of a permanent injury to her heart from a heart attack. Id. at 1179–80. She argued that her condition substantially limited her ability to sleep and breathe. Id. at 1180. In support of her ADA claims, Ms. Lewis testified that she experienced "periodic shortness of breath" which her primary care doctor testified "could" affect Lewis's ability to sleep. Id. (alteration adopted). But because Ms. Lewis introduced no evidence of "the severity, frequency, and duration of these episodes," this Court held she did not provide sufficient evidence to show she was disabled under the ADA. Id. at 1180–81.

Like Ms. Lewis, Ms. Munoz does not point to evidence of the frequency or duration of her pain, exhaustion, sleep problems, or lack of bodily function control. She asserts "there were days she could not leave bed because of pain and fatigue" and she "was house bound from time-to-time." Appellant's Br. at 8, 47. We do not doubt that Ms. Munoz was quite sick at points in her Selig career. But, on review of the record, Ms. Munoz has not provided evidence of how often and how

11

long she experienced these symptoms.  We therefore cannot assess whether her impairments substantially limited her ability to work or sleep as compared to most people in the general population.  See Lewis, 934 F.3d at 1180–81.  This, in turn, means Ms. Munoz has not established she was disabled because she was limited in the major life activities of working or sleeping.

Neither did Ms. Munoz introduce evidence that she was substantially limited in reproductive function when she was employed by Selig.  Reproduction is a major life activity under the ADA.  See Bragdon v. Abbott, 524 U.S. 624, 639, 118 S. Ct. 2196, 2205 (1998).  Of course, endometriosis is a disorder of the reproductive system.  See id. at 660, 118 S. Ct. at 2215 (Rehnquist, J., concurring in the judgment in part and dissenting in part).  By definition, so are uterine fibroids and ovarian cysts.  Even so, Ms. Munoz introduced no evidence that she was substantially limited in her ability to procreate because of these impairments during the time she worked for Selig.  The only relevant evidence in the record is that Ms. Munoz had a hysterectomy in January 2017, which was three-and-a-half years after she was terminated by Selig.  Without more evidence that Ms. Munoz was substantially limited in her ability to reproduce while she worked at Selig, she cannot establish disability for purposes of her ADA claim.  See Cash v. Smith, 231 F.3d 1301, 1306 (11th Cir. 2000) (affirming grant of summary judgment to employer on ADA claim because employee had not "shown that she was

12

substantially limited in any major life activity at the time of the employment actions complained of").

On this record, we cannot say Ms. Munoz is disabled under the ADA. Therefore, the District Court correctly granted summary judgment to Selig on her ADA claims.

B.

Ms. Munoz's FMLA claims find more traction. Accepting her account of the June 6 meeting with Mr. Saine and Mr. Walker as true, a reasonable jury could find Ms. Munoz suffered retaliation for intending to use FMLA leave in the future. Because Ms. Munoz raises triable issues of fact on her claim of FMLA retaliation, we reverse the District Court's grant of summary judgment.

The FMLA provides eligible employees the right to 12 weeks of leave for a serious health condition that makes the employee unable to perform the functions of her position. Batson v. Salvation Army, 897 F.3d 1320, 1328 (11th Cir. 2018) (citing 29 U.S.C. § 2612(a)(1)(D)). The parties agree that Selig is covered by the FMLA and that Ms. Munoz is eligible for FMLA leave. They also agree that Ms. Munoz's health conditions qualified her for FMLA leave. But Selig maintains that it fulfilled its obligations to Ms. Munoz under the FMLA, and that it did not retaliate against her for needing leave under the FMLA. Ms. Munoz disagrees.

1.

Ms. Munoz first claims that Selig interfered with her rights under the FMLA by withholding notice that she was eligible for FMLA leave.

An FMLA interference claim lies if an employee can demonstrate by a preponderance of the evidence that she was entitled to an FMLA benefit and her employer denied her that benefit. Id. at 1331. "When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1). An employer's failure to notify an employee about her right to take FMLA leave "may constitute an interference with, restraint, or denial of the exercise of [her] FMLA rights." Id. § 825.300(e).

Selig never notified Ms. Munoz of her right to take FMLA leave. This failure may well have interfered with Ms. Munoz's FMLA rights.[2] But to prevail

---

[2] To establish that Selig interfered with her FMLA rights, Ms. Munoz would also need to show 1) she gave Selig proper notice of her need for FMLA leave, and 2) Selig willfully interfered with her FMLA rights. As this opinion goes on to discuss, Ms. Munoz gave Selig proper notice of her need for leave, supporting her FMLA interference claim.

However, we decline to weigh in on whether Selig willfully interfered with Ms. Munoz's FMLA rights. Ms. Munoz brought her claims almost three years after Selig terminated her employment. This filing date was outside the FMLA's ordinary two-year statute of limitations. See 29 U.S.C. § 2617(c)(1). We know that if an employer commits a "willful violation" of the FMLA rights guaranteed to the employee, the FMLA provides for an extended, three-year statute

on her FMLA interference claim, Ms. Munoz must show harm from the alleged interference with her rights.  See Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1284 (11th Cir. 1999) (per curiam) ("Even if the defendants have committed certain technical infractions under the FMLA, [a] plaintiff may not recover in the absence of damages.").  This harm must be "remediable by either damages or equitable relief."  Evans v. Books-A-Million, 762 F.3d 1288, 1296 (11th Cir. 2014) (quotation marks omitted).

Under our precedent, Ms. Munoz has not shown she was harmed by Selig's failure to notify her of her right to FMLA leave.  In Graham, an employee alleged that her employer, State Farm, violated the FMLA by failing to inform her of her FMLA rights.  193 F.3d at 1283.  But State Farm "never denied [her] leave time," and "she was provided with more than 170 hours of leave . . . , most of which was paid."  Id. at 1284.  Because the employee received all the leave she requested, this Court held she had "not demonstrated that she suffered any damages as a result of State Farm's actions" and thus could not recover under the FMLA.  Id.  Like the

---

of limitations.  See id. § 2617(c)(2).  Ms. Munoz must meet this standard and show Selig's interference with her rights was "willful" in order to maintain her FMLA interference claim.  To date, this Court has not articulated a standard for what constitutes a willful violation of the FMLA, but many of our sister circuits have confronted this question.  See Sampra v. U.S. Dep't of Transp., 888 F.3d 330, 333–34 (7th Cir. 2018); Bass v. Potter, 522 F.3d 1098, 1103–04 (10th Cir. 2008); Hoffman v. Prof'l Med Team, 394 F.3d 414, 417–18 (6th Cir. 2005); Porter v. N.Y. Univ. Sch. of Law, 392 F.3d 530, 531–32 (2d Cir. 2004) (per curiam); Hanger v. Lake County, 390 F.3d 579, 583 (8th Cir. 2004); Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 33–34 (1st Cir. 2003).  Because Ms. Munoz does not otherwise succeed on her FMLA interference claim, we leave this issue of first impression for another panel in another case.

employee in Graham, Ms. Munoz testified that Selig did not deny her leave time. As a result, Ms. Munoz has not shown damages to support her FMLA interference claim.

Ms. Munoz tries to save her claim by arguing she suffered damages because she "was terminated rather than being granted the opportunity to continue to use . . . intermittent FMLA leave."  Appellant's Br. at 27.  This argument fails.  An employee's damages must be "a result of" the employer's interference with rights guaranteed by the FMLA.  See Graham, 193 F.3d at 1284.  But Ms. Munoz has not identified any evidence that she was terminated as a result of Selig's failure to give her notice of her FMLA rights.  On this record, we affirm the District Court's grant of summary judgment to Selig on Ms. Munoz's FMLA interference claim.

2.

Ms. Munoz also argues that Selig retaliated against her.  She says she was fired because she expressed the need for future FMLA leave and because she refused to sign the Performance Memo.  We are persuaded that these claims should be heard by a jury.

The FMLA prohibits employers from retaliating against employees for engaging in protected activities.  Batson, 897 F.3d at 1328 (citing 29 U.S.C. § 2615(a)(1)-(2)).  We analyze a claim of FMLA retaliation under the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S.

16

792, 93 S. Ct. 1817 (1973).  See Batson, 897 F.3d at 1328–29.  First, the employee must make a prima facie case showing that: (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two.  Id. at 1329.  Next, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse action.  Id.  If the employer does so, the burden shifts back to the employee to produce evidence that the employer's reason is pretextual.  Id.

Ms. Munoz articulated two theories of FMLA retaliation.  First, she says Selig retaliated against her for needing FMLA leave, and second, that Selig retaliated against her for refusing to sign the Performance Memo.  We address each theory in turn.

### a.  Retaliation for Intending to Use Future FMLA Leave

Ms. Munoz has presented a prima facie case that Selig retaliated against her for needing FMLA leave.

### i.  Prima facie case

First, Ms. Munoz suffered an adverse employment action because Selig terminated her.  See Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1234–35 (11th Cir. 2010) (recognizing termination as an adverse employment action).

Ms. Munoz also engaged in statutorily protected conduct.  The FMLA protects an employee who gives "[n]otice of an intent to use FMLA leave in the

17

future." Pereda v. Brookdale Senior Living Cmtys., Inc., 666 F.3d 1269, 1274–75 (11th Cir. 2012). Ms. Munoz testified that she told Selig she would need future FMLA-qualifying leave for tardiness or absence because of her uterine fibroids, ovarian cysts, and endometriosis. The FMLA protects this type of employee activity.

Selig contends that Ms. Munoz's notice of future leave was not protected activity, because she did not give proper notice of her need for leave, including the "anticipated timing or duration" of leave. We are not persuaded. Of course, an employee who needs FMLA leave must give her employer adequate notice of her need. But the FMLA's notice requirements depend on whether an employee's need for leave is foreseeable. See White v. Beltram Edge Tool Supply, Inc., 789 F.3d 1188, 1195 (11th Cir. 2015). If an employee's need for FMLA leave is foreseeable, she must give her employer at least 30 days' advance notice, or "such notice as is practicable." Id. (quoting 29 U.S.C. § 2612(e)(2)). The employee must also disclose the anticipated timing and duration of a foreseeable leave of absence. Id. at 1196. But if an employee's need for leave is not foreseeable, she is not required to give 30 days' notice or provide the timing and duration of the anticipated leave. Id. at 1195–96 (citing 29 C.F.R. § 825.303(a)–(b)). She simply needs to "provide sufficient information for her employer to reasonably determine

18

whether the FMLA may apply to the leave request." Id. at 1196 (alteration adopted) (quoting 29 C.F.R. § 825.303(b)).

Ms. Munoz says her need for leave was unforeseeable because she suffers from "a chronic health condition causing flareups." Appellant's Br. at 24. Because her flareups were unforeseeable, she says, she did not need to notify Selig of the timing or duration of her leave. She is right. Our Court has recognized that employees with health conditions who experience a sudden, acute flareup can demonstrate an unforeseeable need for FMLA leave. See, e.g., White, 789 F.3d at 1196–97 (holding an employee with a preexisting knee injury had an unforeseeable need for leave when the knee suddenly gave out and required surgery); Strickland v. Water Works & Sewer Bd. of Birmingham, 239 F.3d 1199, 1209 (11th Cir. 2001) (holding that an employee with diabetes had an unforeseeable need for leave when he "suffer[ed] a debilitating diabetic attack"). Ms. Munoz introduced evidence her endometriosis and uterine fibroids sometimes caused pain so severe she couldn't move. She also testified she told both Mr. Saine and Mr. Walker of her diagnoses, need for medical treatment, and need for occasional leave to be tardy or absent. The record shows she emailed Mr. Saine and Mr. Walker on specific days she would be absent or late to work because of health issues. Like the plaintiffs in White and Strickland, Ms. Munoz had an unforeseeable need for

19

FMLA leave.  Her actions therefore sufficiently notified Selig of her need for FMLA leave, and her conduct was protected under the FMLA.

Rounding out her prima facie case of retaliation, Ms. Munoz also introduced evidence of a causal connection between her need for future FMLA leave and her termination.  To show a causal connection, an employee must demonstrate that "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated."  McCann v. Tillman, 526 F.3d 1370, 1376 (11th Cir. 2008) (alterations adopted) (discussing causation required for a Title VII retaliation claim).

Ms. Munoz points to a sufficient connection.  First, she testified that she told Mr. Saine and Mr. Walker about her diagnosis of endometriosis and expressed her need for continued intermittent leave, making them aware of her protected conduct.  She testified that Mr. Saine and Mr. Walker did not start looking for ways to fire her until she told them of her diagnosis and treatment.  Indeed, the record reflects that just five days after Ms. Munoz says she told them of her endometriosis diagnosis and need for future leave, Mr. Saine downloaded software onto Munoz's computer to monitor the time she spent off-task.  Three weeks after Ms. Munoz began treatment for endometriosis, Mr. Saine and Mr. Walker prepared the Performance Memo to discipline her for attendance issues.  Ms. Munoz then testified that she was terminated at the June 6 meeting shortly after she objected to

20

being disciplined for sick leave.  Also, Ms. Munoz testified that Mr. Saine

disparagingly referred to her health and use of leave directly before firing her,

telling her that "nobody's sick that long."  Because Ms. Munoz introduced

evidence that Selig was aware of her need for future leave, this proximity in time

between her protected activity and her termination raises an inference of causation.

See Strickland, 239 F.3d at 1207 & n.10.

### ii. Legitimate reason for termination

In response to Ms. Munoz's prima facie case of retaliation, Selig says it fired

Munoz because of her "insubordination, ineffectiveness, and her tendency to

handle personal projects while at work."  Appellee's Br. at 41.  These stated

reasons satisfy Selig's burden "to articulate a legitimate reason for [its] adverse

action."  Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th

Cir. 2006).

### iii. Showing of pretext

In turn, however, Ms. Munoz meets Selig's articulation by introducing

evidence that would allow a factfinder to conclude Selig's stated reasons for firing

her are pretextual.  To show pretext, an employee must introduce evidence

"sufficient to permit a reasonable factfinder to conclude that the reasons given by

the employer were not the real reasons for the adverse employment decision."

Jones v. Gulf Coast Health Care of Del., LLC, 854 F.3d 1261, 1274 (11th Cir.

21

2017) (quotation marks omitted). This evidence may include the evidence already produced by the employee to establish her prima facie case. See id. A showing of pretext arises from "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." Id. (quotation marks omitted).

Ms. Munoz carries her burden to show pretext. She testified that, at the June 6 meeting about her job performance, Mr. Saine and Mr. Walker mostly reprimanded her for being "out" and "late." She says they did not reprimand her for working on personal matters or being insubordinate. She also stated that when they met to discuss the Performance Memo, Mr. Saine and Mr. Walker told her, "You're going to have to square this up. You're not going to be able to be late. You're not going to be able to be out." Ms. Munoz testified that the "common thread" of the meeting was "You've been out" and "You've been late." These comments suggest Selig was more concerned with her absences and tardiness than with Ms. Munoz working on personal matters at work or with her attitude.

Ms. Munoz also claims that Mr. Saine and Mr. Walker began monitoring her computer for signs she was off-task just five days after she told them about her diagnosis of endometriosis and her need for continued sick leave. And she notes she was fired only 37 days after disclosing her diagnosis and asking for future leave. Such "close temporal proximity between [a] request for leave and

22

termination" is evidence of pretext.  Hurlbert, 439 F.3d at 1298 (finding proximity of two weeks to support pretext); see also Jones, 854 F.3d at 1272–73, 1276 (holding that a "one-month period" between returning from FMLA leave and termination supported pretext).

Ms. Munoz also put forth evidence that Selig disapproved of her need for FMLA-qualifying leave.  She testified that when she arrived late to work for health reasons, Mr. Saine would comment, "[L]ook what the cat drug in."  She also testified that, directly before she was fired, Mr. Saine remarked, "Oh nobody's sick that long.  You've been sick for over a year.  Who's sick that long; over a year you've been sick?"  A reasonable jury could find further evidence of pretext from these comments, which suggest that Selig believed Ms. Munoz was misusing sick leave or even faking sickness.

Our Court recently considered a similar case in Jones.  Mr. Jones alleged his employer had fired him in retaliation for taking FMLA leave.  854 F.3d at 1275–76.  While he was employed, Mr. Jones's supervisor told him "'corporate' would not like the timing of Jones's FMLA leave."  Id. at 1271.  Mr. Jones testified that when he was terminated, his supervisor said "corporate believed that [Jones] had abused and misused his FMLA leave" by traveling during his leave period and "demonstrat[ing] his ability to have earlier returned to work."  Id. at 1271, 1275.  But on appeal, Mr. Jones's employer insisted Jones was fired for violating

23

company social-media policy and exhibiting poor managerial judgment. Id. at 1274. Our Court held that Mr. Jones had raised sufficient evidence of pretext, in part because of his employer's comments casting aspersions on his use of FMLA leave. Id. at 1275–76. Especially because the "evidence supporting [the employer's] claim that Jones abused medical leave . . . [was] murky at best," we held a reasonable jury could consider these accusations as evidence of pretext and retaliation. Id. at 1275.

Here too, a reasonable jury could consider the comments to Ms. Munoz as evidence that Selig's non-discriminatory reasons for firing her were pretextual. Viewing the evidence in the light most favorable to Ms. Munoz, a jury could find Mr. Saine intended to discipline Munoz for (untruthfully, in his view) claiming leave for her health conditions. Like the supervisor's comments in Jones, Mr. Saine's comments could be construed to reflect retaliatory animus against Ms. Munoz because she intended to use additional leave. And as in Jones, there is little evidence Ms. Munoz faked her illness in order to claim sick leave, thus adding to her showing that the comments reflected animus.

Selig argues that Ms. Munoz cannot establish pretext. It says Mr. Saine and Mr. Walker were more concerned with her insubordination and distraction at work than her absences or tardiness. Selig contends that Mr. Saine and Mr. Walker never learned that Ms. Munoz was diagnosed with endometriosis, so they did not

24

monitor her computer activity "due to any health condition." Appellee's Br. at 41. Selig also asks us to disregard Mr. Saine's comments as "stray remarks." Id. at 42–43. Selig says that "Saine's comment that 'nobody's sick that long' is unrelated to the challenged employment decision because it was made following Munoz's termination, as they were walking out of the meeting." Id. at 43. Instead, the comment was "intended to point out that Munoz's history of tardiness could not be entirely excused by illness." Id. But through these arguments, Selig urges us to accept the truth of the testimony given by Mr. Saine and Mr. Walker, even though Ms. Munoz testified to the contrary on each point. This we cannot do. A reasonable jury might well adopt Selig's account of these material facts, but this Court cannot resolve these disputes of fact on summary judgment.

Finally, Selig appears to argue that it decided to terminate Ms. Munoz for her "defensiveness in an . . . email exchange" with Mr. Saine and a Selig client "about whether something did or did not occur and whose fault it was." Id. at 41. This email exchange occurred before Ms. Munoz told Mr. Saine and Mr. Walker about her endometriosis diagnosis and need for future leave. Nevertheless, Selig's assertion does not establish, as a matter of law, that Selig is entitled to judgment on the retaliation claim. For example, in Hurlbert, an employer argued that its "decision to terminate [the plaintiff employee] had been set in motion" before he engaged in protected activity by requesting FMLA leave. 439 F.3d at 1299. It

25

pointed to the fact that it ordered the plaintiff to submit to a skills evaluation before he ever requested leave. Id. Nevertheless, our Court held this fact did "not demonstrate that the decision to terminate [the employee] was itself made before the request for leave, or that termination would have occurred regardless of the request." Id.

Ms. Munoz's email exchange with Mr. Saine, while falling short of desirable professional standards, also fails to convince us that, as a matter of law, Selig would have terminated her on this basis. Because of the evidence of retaliatory animus in the record, a reasonable jury could reject Selig's stated reasons for terminating Ms. Munoz. This is how cases proceed at the summary judgment stage. If we were to accept Selig's argument, any misstep an employee makes before engaging in protected activity would allow her employer to evade liability for retaliation under the FMLA, regardless of the evidence of retaliatory animus. On this record, we reverse the grant of summary judgment on Ms. Munoz's first theory of retaliation under the FMLA.

b. *Retaliation for Refusing to Sign the Performance Memo*

Now for Ms. Munoz's second FMLA-retaliation theory. She argues she was terminated for refusing to sign the Performance Memo on June 6 because she believed, in light of the conversations that surrounded its presentation to her, that

26

the Memo violated her FMLA rights.  We also reverse the grant of summary judgment on this theory of retaliation.

The FMLA prohibits covered employers from "discriminat[ing] against any individual for opposing any practice made unlawful" by the FMLA.  29 U.S.C. § 2615(a)(2).  This anti-retaliation provision "is derived from Title VII of the Civil Rights Act of 1964 and is intended . . . to be construed in the same manner."  The Family and Medical Leave Act of 1993, 60 Fed. Reg. 2180, 2218 (Jan. 6, 1995); see also Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1005 (8th Cir. 2012) (describing the FMLA's anti-retaliation provision as "analogous to retaliation claims that are familiar under Title VII").  To state a retaliation claim for opposing illegal practices under Title VII, the employee plaintiff must show she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices" and the employer took adverse action against her for opposing the practices.  Butler v. Ala. Dep't of Transp., 536 F.3d 1209, 1213 (11th Cir. 2008) (quotation marks omitted).  Ms. Munoz must meet the same standard for her FMLA claim.  She must present evidence that she subjectively believed her employer was engaged in unlawful practices, and that her belief was objectively reasonable in light of the facts and record presented.  See id.; see also Graham, 193 F.3d at 1284.

27

Ms. Munoz introduced evidence from which a reasonable jury could find she reasonably believed Selig was engaged in unlawful practices by eliminating her right to FMLA leave. To begin, the Performance Memo listed "Kendra's continued excessive tardiness" and "Kendra's failure to seek Jim and Kent's consent before changing her working hours" as concerns. The Memo also warned that "failure to make the necessary changes will lead to further discipline, up to and including termination." This language alone does not establish that Selig intended to deny Ms. Munoz her right to FMLA leave. Nor, for that matter, does an employer's insistence that its employee sign a performance-issue memo, in and of itself, give the employee an objectively reasonable belief that the employer is engaged in unlawful practices. But Ms. Munoz has alleged more than that. In particular, she testified that when Mr. Saine and Mr. Walker discussed the Memo with her, they instructed, "You're not going to be able to be late. You're not going to be able to be out." She claims they also told her, "You know you need to sign this [Memo] or you will be terminated." According to Ms. Munoz, she responded that her tardiness and absences were caused by her illness, and she did not believe she could sign the Memo because she knew she would have future treatment days. Mr. Saine allegedly retorted, "Oh nobody's sick that long." After this exchange, Ms. Munoz says, she was fired because she would not sign the Performance

28

Memo. Selig admits it fired Ms. Munoz for failing to sign the Memo but otherwise denies her account of the meeting.

In light of Mr. Saine and Mr. Walker's alleged remarks, Ms. Munoz could have reasonably believed that signing the Performance Memo would cause her to lose her right to FMLA leave. The Memo addressed her work attendance and cautioned that she could be terminated if she failed to make necessary changes. Mr. Saine and Mr. Walker allegedly emphasized that Ms. Munoz could not be late or absent anymore. Ms. Munoz claims that when she explained she would need more leave time for sickness and treatment, they did not acknowledge or alleviate this concern. Instead, Ms. Munoz alleges that Mr. Saine dismissed it and implied that Ms. Munoz was not entitled to leave for sickness or treatment. Given these circumstances, a jury could find Ms. Munoz reasonably believed she was opposing practices made unlawful by the FMLA by refusing to sign the Performance Memo.

Our precedent supports allowing a jury to decide whether Ms. Munoz's belief was objectively reasonable in this context. In Graham, the employee plaintiff brought an FMLA claim of retaliation. 193 F.3d at 1283. Ms. Graham suffered from injuries from a car accident, and she took time away from work for treatment and on account of pain. Id. at 1277–79. To support her claim of retaliation, she alleged that a memorandum from her employer documenting her series of absences from the office "led her to believe that she was going to be

29

terminated if she missed any more days of work," even if further absences were FMLA-qualifying. See id. at 1284. Because of this memorandum, Ms. Graham said, she was forced to resign due to intolerable working conditions. Id. Our Court held that Ms. Graham's belief that she would be fired for taking FMLA leave was objectively unreasonable as a matter of law. Id. But in Ms. Graham's case, the employer's memo specified that "[f]urther non-FMLA protected absences could . . . result in disciplinary action." Id. at 1284 & n.2 (emphasis added). And the employer had a policy that "only non-FMLA protected absences resulted in absentee memos." Id. at 1276.

Ms. Munoz received no assurances that she could continue to exercise her right to FMLA-qualifying leave. Again, viewed in the light most favorable to her, the circumstances at the June 6 meeting strongly indicated the opposite. Ms. Munoz claims that when she brought up her need to take leave that would qualify for protection under the FMLA, she was dismissed. And unlike the employer in Graham, when taking stock of employee attendance Selig did not distinguish between FMLA-protected absences and tardies from those not protected under the statute. Again here, a jury could reasonably conclude she was terminated for opposing practices she reasonably believed to be illegal under the FMLA.

Selig argues Ms. Munoz's belief was unreasonable because "the document itself did not specifically indicate or imply that by signing Munoz was agreeing

30

that further FMLA-related absences or late appearances would result in termination." Appellee's Br. at 38. Selig says her "signature was merely intended to acknowledge receipt of the Memorandum and an understanding of her supervisors' concerns." Id. Selig points to the fact that Ms. Munoz previously received and signed a similar performance-improvement memo in 2010, so she could not reasonably believe that signing the 2013 Performance Memo would compromise her FMLA rights. Id. at 38–39. The Dissent also points to the 2010 memorandum as evidence that Ms. Munoz's belief was not reasonable. See Dissenting Op. at 49–55. And Mr. Saine testified that he told Ms. Munoz her signature would merely document the meeting, not indicate Munoz's agreement with the Memo's contents.

But, once again, that argument fails to account for Ms. Munoz's version of the facts. Accepting Ms. Munoz's account of the June 6 meeting, she reasonably believed that signing the Memo would waive her FMLA rights, because she understood Mr. Saine and Mr. Walker to communicate as much.[3] Ms. Munoz

---

[3] The fact that Ms. Munoz says her employers essentially told her that she would be waiving her statutorily protected rights by signing the Memorandum also distinguishes this case from those the Dissent relies upon. See Dissenting Op. at 40–46. In none of those cases did the aggrieved employees allege that the employers made such a representation. Here there is no question that the alleged conduct—requiring Ms. Munoz to sign a Memorandum waiving her FMLA rights— is unlawful. See Dissenting Op. at 62–63. Instead, the question is whether Ms. Munoz reasonably believed that this is what she was being asked to do, given what she says her bosses stated during the June 6 meeting. If Ms. Munoz was wrong about the effect of the Memorandum under Georgia contract law, as the Dissent argues, then, according to Ms. Munoz's account of the June 6 meeting, so were Mr. Saine and Mr. Walker—the people who drafted the

31

testified that, during the meeting, she brought up her right to take leave for sickness and treatment. She claims that she told Mr. Saine and Mr. Walker she believed signing the Memo would subject her to discipline for further FMLA-qualifying leave. Her two supervisors did nothing, according to Ms. Munoz, to clear up her understanding. Instead, Mr. Saine indicated perhaps she should not receive future leave because she was not legitimately ill. Ms. Munoz claims she then refused to sign the Performance Memo, saying, "I'm not signing this[,] guys[,] because . . . this goes against everything that I am doing here. I have endometriosis, how, how can I not be out anymore, how can I effectively remedy this situation when I have a chronic illness and you already know I'm going to be late and you know I've been late because of it." She says she was then fired for refusing to sign.

Selig does not persuade us that Ms. Munoz's belief about the Memo's effect is unreasonable, when—according to her—Mr. Saine and Mr. Walker did nothing to correct her belief. Again, Selig's version of the facts may well be true: Mr. Saine may have counseled Ms. Munoz about the implications of signing the

---

Memorandum and insisted she sign it or face termination. The fact that the Memorandum did not specify that only "non-FMLA protected absences" would result in a sanction, coupled with Mr. Saine and Mr. Walker's statements at the June 6 meeting that Ms. Munoz would no longer be entitled to FMLA-protected leave as a result of signing the Memorandum, means that there remains a factual dispute regarding the objective reasonableness of Ms. Munoz's belief about the effect of the Memorandum. See Graham, 193 F.3d at 1284 & n.2. This is not a dispute we can resolve at the summary judgment stage.

32

Memo, just as Munoz may not have brought up her health concerns until after she was fired. And Mr. Saine may not have expressed doubt about her illness until after she had been terminated. Under this view of the facts, Ms. Munoz's understanding that the Performance Memo terminated her right to future FMLA leave would be objectively unreasonable. But a factfinder, not this Court, should resolve these disputes.

## V.

In sum, the District Court correctly granted summary judgment to Selig on Ms. Munoz's ADA and FMLA interference claims. But there are a number of factual disputes that are material to her FMLA retaliation claim, so summary judgment was not appropriate on this point. We reverse the grant of summary judgment on Ms. Munoz's retaliation claim and remand for further proceedings on that claim. The District Court's judgment is otherwise affirmed.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

JULIE CARNES, Circuit Judge, concurring in part and dissenting in part:

The majority opinion affirms the district court's grant of summary judgment to defendant Selig Enterprises on plaintiff Kendra Munoz's ADA and substantive FMLA claims, and I concur. The majority opinion reverses the district court's grant of summary judgment to Defendant on Munoz's FMLA retaliation claim. I concur as to the majority's first ground for that ruling, but strongly dissent as to its second ground.

As the primary basis for her claim of retaliation, Munoz alleges that she was fired because she had informed her employer, defendant Selig, that she would continue to need to take some time off—here and there—to address a medical issue. Although the FMLA does not expressly use the term "retaliate," we have held that an employer cannot retaliate against an employee who engages in conduct that is protected by the FMLA. Notifying one's employer that one will need time off to attend to a serious medical issue is obviously an act protected by the FMLA: indeed, it is the focus of the statute. And I agree with the majority that a jury question exists as to whether Defendant fired Munoz because she had notified Defendant of her continuing need to take medical leave, as opposed to other legitimate reasons it had for terminating her employment.

Had the majority left it at that, they would hear no disagreement from me. But the majority goes further, reaching out to identify a new kind of protected act.

34

Specifically, the majority opinion holds that a jury should decide whether Munoz also engaged in protected conduct under the FMLA when she refused to acknowledge, via her signature, that she had received a performance memorandum from her employer expressing the latter's concern with various aspects of Munoz's attitude and job performance. Not surprisingly, the FMLA nowhere prohibits an employer from giving its employee a memorandum setting out the employer's concerns about the employee's job performance, nor does the statute prohibit the employer from requiring the employee to acknowledge her receipt of such a memorandum. Indeed, the majority opinion acknowledges that Munoz's refusal to acknowledge receipt of the document was not prohibited by the FMLA (or any other statute).

Yet, the majority concludes that it might have been objectively reasonable for Munoz to conclude that Defendant was engaging in unlawful conduct when it directed her to acknowledge receipt of the document. And rather than decide—as our court has typically done—whether an employee's belief that particular conduct is protected by statute is an objectively reasonable belief, the majority laterals this novel question to a jury to decide.

In so ruling, the majority has largely jettisoned the objectively-reasonable-belief test that we have long used to gauge whether an employee's conduct should be deemed to be protected against an adverse action by the employer—the

35

majority's lip-service to that test notwithstanding.  Moreover, on the facts of this case[1]—and even with the generous assumption that Munoz actually believed that her refusal to acknowledge receipt of the document constituted protected conduct under the statute—I find it impossible to conclude that any such belief by Munoz was objectively reasonable.  And it is our responsibility, when the record prompts such a conclusion, not to abandon our duty to say so.  Finally, in fashioning a jury question on this novel proposition, the majority has greatly shifted—and arguably mooted—what is the proper focus of a jury inquiry:  whether Munoz proved that but for her notification of continuing medical leave, Defendant would not have fired her.

To explain my disagreement with the majority's unique holding, I first set out the legal framework for this type of inquiry, and then explain why one cannot reasonably conclude that it was objectively reasonable for Munoz to believe her refusal to acknowledge receipt of her employer's memorandum of concerns was protected conduct under the FMLA.

I.    **Legal Framework**

As pertinent to this case, the central right established by the FMLA is the entitlement of up to 12 weeks of leave each year "[b]ecause of a serious health

---

[1]  Whenever I use the phrase "facts of this case" or "the record," I mean the facts taken in the light most favorable to the non-movant, plaintiff Munoz.

condition that makes the employee unable to perform the functions of [her] position." 29 U.S.C. § 2612(a)(1)(d). Although the statute nowhere expressly prohibits retaliation by an employer against an employee who has attempted to exercise her right to take medical leave, "we have held that it also 'prohibits an employer from retaliating against an employee who attempts to exercise any FMLA-created right.'" *Martin v. Fin. Asset Mgmt. Sys.*, 959 F.3d 1048, 1052 (11th Cir. 2020), *citing Walker v. Elmore Cty. Bd. of Educ.*, 379 F.3d 1249, 1250 (11th Cir. 2004). "In plain English, 'an employer may not do bad things to an employee who has exercised or attempted to exercise any rights under the statute.'" *Martin*, *id.*, *citing Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 n.5 (11th Cir. 2000).

In examining a retaliation claim under the FMLA, we apply the same *McDonnell Douglas* test that is used for retaliation claims made pursuant to other federal employment statutes. The plaintiff-employee must first establish a prima facie case of retaliation, which requires that she demonstrate (1) that she engaged in statutorily protected conduct; (2) that she suffered an adverse employment action; and (3) that a causal connection exists between the two. *Batson v. Salvation Army*, 897 F.3d 1320, 1329 (11th Cir. 2018). Once the plaintiff has established a prima face case, the burden shifts to the employer to articulate a nonretaliatory reason for the adverse action. If the employer does so, the burden

shifts back to the employee to present evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Id.*

Our panel unanimously agrees that Munoz's notification of her likely need for continuing intermittent leave constituted conduct that is protected by the FMLA, and that Munoz has introduced evidence sufficient to defeat summary judgment on her claim that Defendant fired Munoz in retaliation for that notification. I part company with the majority on Munoz's back-up argument that she also engaged in protected conduct when she refused her employer's directive that she acknowledge, with her signature, her receipt of a written memorandum setting out her employer's many concerns with her job performance. And, of course, absent a showing by Munoz that her refusal to comply was protected by the statute, she lacks any legitimate basis for launching a retaliation claim based on Defendant's response to that non-compliance.

So, the first question is whether Munoz's refusal to acknowledge receipt of a document given to her by her employer constituted protected conduct. The answer is obvious: of course, it was not protected by the FMLA or any other statute. Memoranda from employers to employees counseling the latter as to needed improvements have become a regular feature of the workplace. And they are a good thing for both the employer and the employee. They give the employer a

38

chance to work with its employee on issues of concern and allow the employee a chance to learn about these issues while there is still time to make things right. It is also a sensible practice to have the employee sign an acknowledgment of receipt of the memorandum to eliminate disputes later on as to whether the employer actually communicated its concerns.

In fact, the majority agrees that the FMLA does not prohibit an employer from advising its employee of the employer's concerns nor from requiring the employee to sign an acknowledgement that she has received the document. That being so, Munoz can succeed on her argument that her conduct was protected only if she meets the two-prong test we have established in this area. Specifically, a plaintiff alleging that she was retaliated against for engaging in conduct that is protected must show two things: (1) that she actually, subjectively, believed that her employer was engaged in conduct made unlawful by the statute and (2) that this belief was an objectively reasonable belief. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956 (11th Cir. 1997). There we said,

> It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. <u>It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.</u>

39

*Id*. at 960 (underlined emphasis added).

In a summary judgment analysis, we typically spot the non-movant plaintiff the subjective element, and assume that a jury should decide that question.[2]  But we do not take such a deferential view when assessing the objective reasonableness of an incorrect belief by an employee.  Unlike the fuzzy approach the majority has taken here, our caselaw has treated this test as more robust in its requirements.  For example, in *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385 (11th Cir. 1998), the male plaintiffs opposed the company's grooming policy, which permitted women but not men to wear long hair, and they were fired after they refused to cut their hair.  Affirming summary judgment for the company, we concluded that the plaintiffs' belief that the grooming policy was discriminatory under Title VII was not objectively reasonable, as the caselaw around the country and in our own court had held such policies to be nondiscriminatory.  *Id.* at 1388. We rejected the plaintiffs' argument that, "when judging the reasonableness of their belief, we should not charge them with substantive knowledge of the law . . . ."  *Id.* at n.2.  To accede to the plaintiffs' argument, we noted, "would eviscerate the objective component of our reasonableness inquiry" because "[i]f the plaintiffs are free to disclaim knowledge of the substantive law, the

---

[2]  Albeit this is one of those cases where the record calls into great question even the subjective prong of the test for Munoz.

40

reasonableness inquiry becomes no more than speculation regarding their subjective knowledge." *Id*. (emphasis added).

In *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999), the employer indicated that it had fired the plaintiff because of frequent tardiness and her false explanations for that conduct. She sued and alleged that she was actually fired for opposing sexually harassing conduct in violation of Title VII. *Id.* at 1350–51. We concluded that the plaintiff had not shown to be objectively reasonable her belief that the conduct in question constituted sexual harassment. We stated, "We do not mean to hold that the conduct opposed must actually be sexual harassment, but it must be close enough to support an objectively reasonable belief that it is. The conduct Clover described misses the mark by a country mile." *Id.* at 1351 (emphasis added).

In *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318 (11th Cir. 1998), the plaintiff alleged that he was retaliated against by his employer, in violation of the ADA, because he requested accommodations for his alleged disability, which was a bad back. We concluded that not only was he wrong that he was disabled but that he had failed to produce evidence sufficient to "allow a rational fact finder to conclude that his belief that he was disabled under the ADA was objectively reasonable." Having failed to make this showing, we held that the plaintiff could not establish that he had engaged in protected conduct. *Id.* at 1329.

41

In *Butler v. Alabama Department of Transportation*, 536 F.3d 1209, 1213 (11th Cir. 2008), the plaintiff alleged that her employer's issuance of a letter of counsel regarding her excessive absenteeism and failure to follow call-in procedures for unscheduled absences was done to retaliate against her because she had reported a racially hostile environment. We held that because it was objectively unreasonable for the plaintiff to believe that a co-employee's isolated use of racially discriminatory language constituted a racially abusive working environment, her complaint about this incident did not constitute protected conduct and therefore the district court should have granted the defendant a judgment as a matter of law following trial on the retaliation claim. *Id*. at 1213–14, 1217.

In *Dixon v. Hallmark Companies, Inc.*, 627 F.3d 849 (11th Cir. 2010), the plaintiffs argued that they had been fired on religious grounds in violation of Title VII because they had protested their employer's refusal to allow them to keep religious symbols in their workplace. They argued that this refusal constituted an unlawful employment practice. *Id.* at 857. Noting that the plaintiffs had "<u>called attention to no statutory or case law</u> that can reasonably be believed to prohibit a private employer from keeping its own workplace free of religious references," we concluded that the plaintiffs had failed to satisfy the objective prong of the protected-conduct test and had therefore failed to show that they had engaged in protected conduct. *Id*. (emphasis added).

42

In *Howard v. Walgreen Co.*, 605 F.3d 1239 (11th Cir. 2010), the plaintiff claimed that he was retaliated against after he complained about a racially discriminatory remark directed at him by a supervisor and was later fired. Both his racial discrimination claim and the retaliation claim went to a jury. The latter found for the employer on the discrimination claim, but for the plaintiff on the retaliation claim. On appeal, we held that the district court should have granted a motion for judgment as a matter of law on the retaliation claim. *Id*. at 1242. We noted that it was not enough that the plaintiff actually believed that the comment constituted racial discrimination. Instead, that belief must have been objectively reasonable. *Id*. at 1244. And measuring the particular conduct under existing substantive law, it was clear that such a belief was not objectively reasonable because discrimination under Title VII requires an adverse action, which did not occur merely by virtue of a supervisor's remark. *Id.* at 1244–45. Consequently, this was not a question for a jury, but instead it should have been decided as a matter of law. *Id.* at 1245. *See Brungart*, 231 F.3d at 799 n.6 ("the standard for granting summary judgment mirrors the standard for judgment as a matter of law such that the inquiry under each is the same.")

In *Weeks v. Harden Manufacturing Corp.*, 291 F.3d 1307 (11th Cir. 2002), the employer required each of its employees to agree to arbitrate all claims arising out of his or her employment, including all Title VII or discrimination claims. *Id.*

at 1310.  The plaintiffs refused to sign the agreement, and they were fired.  They

sued, arguing that, in firing them, the employer had retaliated based on the

plaintiffs' opposition to the employer's unlawful conduct, which alleged unlawful

conduct was the employer's insistence that the employees sign the arbitration

agreement.  Although the district court agreed that an employer could properly

require its employees to sign the arbitration agreement, it nonetheless denied the

employer's motion for summary judgment.  The court reasoned that, albeit

mistaken in their belief that the employer had acted unlawfully by requiring them

to sign the agreement, the plaintiffs' incorrect belief was reasonable, and therefore

it constituted protected conduct.  *Id*. at 1311.

On interlocutory appeal, we reversed the district court, concluding that the

plaintiffs' belief was not an objectively reasonable belief and that the district court

should therefore have granted summary judgment to the employer.  We noted that

such agreements have been accepted by almost all courts, including our own.  *Id*. at

1313–16.  Moreover, that the plaintiffs may have been ignorant of the substantive

law did not render their belief reasonable.  *Id.* at 1317.  Indeed, to hold "that the

action of an employer requiring employees to arbitrate employment disputes is an

'unlawful' employment practice would require an intellectual dishonesty in which

this court will not engage."  *Id*. at 1316 (emphasis added).  Substitute the phrase

44

"to acknowledge receipt of a memorandum" for the phrase "to arbitrate employment disputes" and you have the case now before this panel.

In short, our caselaw makes clear that an employee's actual, mistaken belief that her employer has engaged in unlawful conduct does not necessarily constitute an objectively reasonable belief. And there is a great deal more rigor to the objective-reasonableness test than is reflected in the majority opinion's conclusory explanation for its determination that Munoz's belief satisfied this test. Indeed, the majority opinion largely ignores the above caselaw.[3] Moreover, as discussed in greater detail below, Munoz comes nowhere close to meeting that test. First, she presents a far less persuasive case than did the plaintiffs in the cases discussed above, all of whom we held to have failed the objective-reasonableness test. There is simply no legal basis for an argument that merely by acknowledging receipt of a document reflecting the concerns of one's employer that the employee has waived

---

[3] Instead of grappling with the above caselaw, the majority opinion cites to one inapt case in support of its reasoning: *Graham v. State Farm Mutual Insurance Company*, 193 F.3d 1274 (11th Cir. 1999). *Graham* bears little similarity, factually or legally, to the protected-conduct issue before us. In *Graham*, the plaintiff, who had been denied requested FMLA leave, had resigned her position after receiving a memorandum counseling her about her excessive non-FMLA absences from work. *Id*. at 1279–81. Adopting the opinion of the district court, we made no pronouncement whether the plaintiff had engaged in protected conduct and was thereafter retaliated against for that conduct, meaning we did not discuss the objective reasonableness of any belief the plaintiff may have had. Rather, we held that there was no basis for the plaintiff's FMLA retaliation claim because the memorandum was not an adverse action. *Id*. at 1283–84. Moreover, we rejected the plaintiff's claim that she had been constructively discharged, reasoning that no reasonable employee in these circumstances would consider her working conditions to be so intolerable that she was forced to resign. *Id.* at 1284.

any legal rights. Second, Munoz knew this full well as she had been through the memorandum process before. From her own experience, she was well aware that, in acknowledging receipt of such a memorandum, she was in no way expressing any concessions toward her employer or agreement with the latter's criticisms. I address this latter point next before turning to the legal insufficiency of Munoz's position.

## II.    Munoz's Purported Belief Was Not Objectively Reasonable

### A.    Munoz's Purported Basis For Arguing that She Engaged In Protected Conduct

For the last few years of her tenure at Selig Enterprises, Munoz had been a very challenging employee. As a result, in June 2013, her two supervisors met with her to discuss their ongoing concerns, handing her a written memorandum setting out those concerns. At the end of the meeting, they asked that she affix her signature on the line of the document indicating her acknowledgement that she had received the document. She refused. As the supervisors' concerns included what they believed to be Munoz's confrontational, uncooperative attitude, this final act of insubordination suggested the unlikelihood that Munoz's attitude was going to improve. They therefore suspended the meeting for fifteen minutes to speak to their attorney about their options. When they returned, they told Munoz that if she refused to sign the acknowledgement line showing her receipt of the memorandum, they would have to fire her. She refused. They fired her.

46

As noted, our panel unanimously agrees that there is a disputed issue of fact as to whether Defendant fired Munoz because of her insubordination—as reflected in this refusal to acknowledge receipt of the memorandum—combined with what her supervisors deemed to be her longstanding pattern of combative responses to their requests, or whether instead Defendant fired Munoz because she had notified them that she would continue to need intermittent leave to deal with a health problem.  And as a request for such leave is protected against retaliation under the FMLA, our panel agrees that a jury must decide whether Munoz has proven that but for this notification, she would not have been fired.  *See generally Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

Yet, also as noted, I strongly disagree with the majority's identification of a second protected act on which a jury could properly base a finding of retaliation. The majority holds that Munoz may well have engaged in additional protected conduct when she refused to place her signature on the line of the memorandum of concerns denoting an acknowledgement of its receipt.  And instead of deciding whether, on this record, such conduct can be deemed to be protected, the majority says a jury should decide.

Contrary to Munoz's position, the majority does agree that an employer does not engage in unlawful conduct merely by asking an employee to sign an acknowledgement of receipt of a document expressing her employer's concerns.

47

That being so, Munoz presses her second argument:  even if wrong, she believed that her employer acted unlawfully when it directed her to acknowledge receipt of the memo because she  believed that, by doing so, she would be waiving any ability to assert her FMLA right to take future medical leave.  And the majority says this mistaken belief might have been an objectively reasonable belief.  The majority so speculates even though the memorandum nowhere indicates that Munoz was waiving any rights—FMLA-related or otherwise—merely by acknowledging she had received the memorandum.  Moreover, given Munoz's own experience with this process, she could not have reasonably believed that merely by acknowledging her receipt of the memorandum, she was indicating her agreement with her supervisors' concerns or otherwise waiving any rights.  Why is this so?  Because three years before, in 2010, Munoz had been presented with a memorandum of similar concerns.  On that occasion, she not only signed the acknowledgement but took the initiative to prepare her own counter-memorandum challenging some of the criticisms of her supervisors.  Thus, Munoz was well aware that a mere acknowledgement of receipt of a memorandum did not indicate agreement with the comments made in the memorandum nor estop her from challenging any criticism via her own separate memorandum.  She knew it meant only one thing:  that she had received the memorandum.

B.    The 2010 Memorandum of Concerns

An understanding of the 2010 memorandum and the process that led to its issuance is important in evaluating the absence of any objectively reasonable belief by Munoz that she would have been forfeiting FMLA rights had she signed the 2013 memorandum. To set the stage for the 2010 memo, Munoz had gotten mad at her supervisors when they refused to let her leave immediately once it had started snowing. In a moment of pique, she began "slamming everything," packed all her belongings in a box, and "stormed out" of the office as if she was quitting. This created disruption and confusion as to whether Munoz was resigning her position, which she apparently decided against as she returned to the office the next day. But her dramatic exit led to the issuance of the January 13, 2010 memorandum. Signed by the two men for whom she worked—Jim Saine and Kent Walker—as well as CFO Ron Stein, the memorandum set out Selig's concerns about Munoz's attitude and job performance and summarized the meeting relating to those concerns that occurred between Munoz, Saine, Walker, and Stein on the previous day. Munoz signed the memorandum that Selig presented to her in the block that acknowledged she had received it. She did so even though she clearly did not agree with all of its contents, as evidenced by the fact that she shortly thereafter produced her own memorandum setting out her own version of the meeting and disputing some of the criticisms directed toward her.

49

A deep dive into those two competing 2010 memoranda is revealing.  As to the first item on the list, Selig's memorandum indicated that it and Munoz mutually recognized that "Kendra packing up and taking all her personal belongings was an emotional response to the situation and inappropriate, and although the perception was that Kendra was implicitly 'quitting,' that was not her intent."  Nonetheless, Selig concluded, "To clarify for the future, should this occur again Selig will consider her actions an explicit resignation from her employment." In her own memorandum, Munoz reflected a somewhat different view of the incident, casting some blame on her boss for her behavior.[4]

As to Item 2, the Selig memo stated, "It is important that everyone work as a team and pitch in on activities that might otherwise be outside our normal job function.  Munoz' response in her memorandum was to deny her own lack of teamwork, instead implicitly faulting Saine and Walker for their 'harshness.'"[5]

---

[4] In explaining her behavior in her own memorandum, Munoz indicated that she did not intend to quit when she left work early, but that instead she was simply taking her lunch break late that day at 3:45.  As to why she packed up all her personal belongings and took them with her as she was taking this late lunch break, Munoz's memorandum explained that she was "responding outwardly" to Saine's email (declining to close the office due to the snow).  Apparently considering Saine to have been partially to blame for her angry exit, she further stated that she and her supervisors had agreed not to provoke each other to such a point in the future, and she agreed not to remove her personal belongings again when she was upset.

[5] Munoz's memorandum agreed with the need for teamwork, although she "did not agree with the characterization by some of her lack of teamwork."  She further indicated that Saine and Walker explained that they were under tremendous pressure to produce and if they had to "lean on various other departments," this would have to be done, even though they may sometimes be perceived as "harsh or to the point or matter of fact by some."

Responding to Munoz's complaints of racial harassment in the Selig workplace, Item 3 of the Selig memo indicated that it takes racial harassment seriously and that if Munoz believes she has been the victim of harassment, it is her responsibility to report that to an officer or the senior management. For her part, Munoz's memorandum contests Selig's suggestion that she had failed to do so.[6]

Item 4 of the Selig memo noted the need for Munoz to follow Selig's protocol for taking paid time-off (PTO) and for Munoz to reduce her number of tardy arrivals. The memorandum further indicated that its policies require Munoz to have her paid leave "approved in advance where possible by Jim and Kent." While recognizing Munoz's interest in participating in her children's activities, the memorandum indicated that Selig would try to be as accommodating as possible, but that the interests of the business must take precedence. This item of the memo indicated the mutual agreement of Munoz and Selig that Munoz had been arriving to work late an unacceptable number of times and that Munoz agreed to improve. The memo indicated that the goal was to never be late, but that if Munoz was late more than 5 times in a month, "this would clearly be unacceptable." In response,

---

[6] Munoz's response, in part, which was identified in her memorandum as Item 4, was that she had reported inappropriate comments "in every instance in the past. Her concern now is what happens in the future?"

Munoz's memorandum indicated that she had improved and she explained her difficulties arriving to work on time, given her long commute.[7]

As to Item 5, Selig's memo indicated that this item concerned discussion of procedural "issues" and that further elaboration in the memorandum was unnecessary. Apparently thinking that a good deal more elaboration was necessary, Munoz addressed the topic in her own memo, at Item 5, fleshing out her own position on what she characterized as procedural "changes." Munoz, whose duty was to provide administrative assistance to Saine and Walker, acknowledged their request that she answer their calls, direct them accordingly, and not let their calls go directly to voicemail when they were on vacation; she agreed to accede to their request going forward. She further noted that when she has to leave work early and "advance notice is not possible, such as in the case of an emergency or unforeseen appointment," instead of communicating her departure via an email to the two staff members who keep track of employee leave, she would verbally inform her bosses, Saine and Walker, that she was about to leave work. Then "[o]nce Kent, Jim, and Kendra have a definitive understanding and agreement of

---

[7] At Item 6, Munoz indicated that she had "made significant improvement" in providing her requests for PTO in advance. And she recognized that it was within Selig's discretion whether to grant a particular request. As to tardiness, Munoz acknowledged that she had been tardy "an unacceptable number of times," but explained that it was difficult to get "from Austell, to Mableton, to Midtown to arrive prior to 8:20 a.m. each morning (which includes the 5 minute grace period)." She nonetheless agreed that should she be tardy more than 5 times in a month that Selig would "need to take immediate action to remedy her tardiness."

the circumstances surrounding her need to leave early, it was agreed at the time, if feasibly possible, Kendra should then follow up with an email copying" the two staff members.

As to Item 6, the Selig memorandum indicated that Saine and Walker "were generally concerned about Kendra's defensive reaction to requests, such as when a broker inquired about the status of returning a Lease, and her failure to listen promptly to voice messages that required an action on her part, which Kendra acknowledged." It further noted that Munoz expressed concern about "being talked down to," that Walker "agreed to improve," and that Munoz, Saine, and Walker agreed to address concerns between them as promptly as possible. Nonetheless, the memo concluded: "For clarification, although Kendra, Kent and Jim are a team, Kent and Jim have the final responsibility to insure that their department is operating to their satisfaction."

In her own memo, Munoz responded to what was a one-paragraph summary in the Selig memo concerning Munoz's "defensive reaction to requests" with four paragraphs of her own, identified as Items 7–10. In response to an example offered by Selig—broker inquiries about the status of returning to them a lease— Item 7 of Munoz's memo downplayed the significance of her supervisors' concerns about her non-responsiveness, "explain[ing] that she gets those requests all the time from anxious brokers. 99% of the time the lease documents have

already been sent back to them or are being signed by Steve (the CEO)." She also understood that Saine and Walker's concerns regarding her defensiveness "at times were valid" and that "having the right attitude can make or break any relationship."

As to whom she apparently suspected to be an individual with the wrong attitude, Munoz is not subtle, stating in ¶ 8 of her memo, "Kent [Walker] recognized and agreed that he is fully aware of his condescending manner and tone at times. He said that it is an issue even his family has brought to his attention and correcting the behavior is a work in progress that he is actively working to improve. Kendra whole-heartedly understands that we are all a work in progress and supports Kent's efforts."

Turning her aim to her other boss, Jim Saine, she continued, "Jim agreed that Kendra's concerns over his sarcastic and sometimes provoking responses were valid, and he agreed to work to correct those tendencies by not having a knee-jerk reaction response to Kendra's actions that may irritate him. Jim mentioned that at times he can be a little quick on responding in emotion rather than pausing for a period of time, then giving a well thought out appropriate response. Kendra understands that we are all very passionate about our careers and sometimes our emotions can get the better of us as human beings, and she supports Jim in his efforts."

Wrapping up these reflections on the topic of her defensiveness when supervisors addressed her about work assignments, Munoz repeated CFO Ron Stein's remarks during the discussion that "sarcasm has played a role in the group interaction, which has had a negative impact on the work relationship. He noted that less sarcasm on everyone's part would serve all three parties well," a sentiment to which all parties agreed. Munoz repeated the analogy of a three-legged stool, essentially explaining that to stand strong, all three legs of the professional relation between her, Saine, and Walker had to work harmoniously.

Just as Munoz had earlier acknowledged receipt of the Selig memorandum with her signature, Selig officials signed off on Munoz's memorandum, acknowledging by their signatures the receipt of that document. In short, Munoz signed the block of the 2010 Selig memorandum acknowledging her receipt of the document. But, given her authorship of a counter-memo, it is clear that she did not view this acknowledgement as reflecting her agreement with any criticisms nor a concession of any rights she might have as an employee. Nor was Munoz reluctant to push-back on her supervisor's criticism or shy about leveling criticism against her bosses. Indeed, she was assertive enough to take the initiative to draft her own competing memorandum setting out her position on all issues. Which brings us to the 2013 memorandum at issue in this case.

C.    The 2013 Memorandum

1.    Events Leading up to the 2013 Memorandum

Before addressing the 2013 memorandum, it is helpful to provide some background concerning Selig's attendance policies and the timeline of significant events leading to the issuance of that memorandum. Selig allowed each employee 20 days of paid leave (PTO) each year. As for doctor's appointments, Selig's policy was generous, and did not require the taking of any leave for a doctor's appointment so long as the employee worked five hours on the day of the appointment. As to tardiness, Munoz had been tardy an excessive number of times during her tenure—both before she developed health issues and after. But several other employees were likewise tardy—some more than Munoz—and no Selig employee had ever been fired for tardiness. Further, Munoz does not aver that she was ever docked pay or otherwise disciplined for her tardiness prior to the June 2013 meeting with her supervisors, nor that she was ever penalized for her doctor's appointments. Likewise, she agrees that she was never denied PTO when she requested it and that she always received an annual bonus.

In October 2011, Munoz began suffering from back and abdominal pain attributed to uterine fibroids or cysts. In January 2012 and again in November 2012, she shared with her supervisors that she was experiencing some health issues. The majority opinion indicates that, prior to developing these symptoms,

56

Munoz had been tardy 72 days in 2009 and 53 days in 2010. During 2011, she was tardy 23 times. After the onset of her symptoms, she was tardy 75 days in 2012 and 32 days from January-June 2013. In other words, she had an uptick in tardies after developing health issues, albeit her record of tardy arrivals was numerous even before that time. Moreover, Munoz concedes that none of her tardies were related to health issues prior to October 2011 and that not all the tardies thereafter were prompted by illness.

Although her symptomology did not change, Munoz was finally given a diagnosis for her condition in late April 2013—endometriosis—and she advised her supervisors that she would continue to need some time off here and there to deal with this condition. Her supervisors testified that, although her continuing tardiness remained a concern, that issue was not what prompted their June 2013 meeting with her. Instead, just as the tardiness had persisted even after the 2010 meeting and memoranda, so had Munoz's combative attitude. According to Kent Walker, Munoz was defensive and unwilling to take responsibility whenever she had made a mistake or failed to handle an assignment: "You really couldn't go to her with an issue because you didn't know exactly how she was . . .going to respond to it." Jim Saine echoed that concern, testifying that that he and Walker "ended up doing a lot of work ourselves" or trying to find someone else in another department to do the work because it was too difficult dealing with Munoz's

resistance.  Saine testified that he could no longer count on his work being done promptly and that he "purposely avoided" giving her work for that reason.

Just as these supervisors experienced considerable push-back from Munoz whenever they inquired about the status of their work, they also became concerned that one reason for her slowness was that Munoz's personal affairs took precedence over completing her job duties.  According to Saine, Munoz would wait until the eleventh hour to complete tasks, while he would hear her on personal telephone calls, laughing and chatting away.  Accordingly, he performed some surveillance of her work computer to determine what she was actually doing each day, and was "shock[ed]" to discover that Munoz was spending a great deal of her workday on personal tasks.

Saine learned that Munoz was off task on nine days in May and on three days in June 2013.  That is nearly half the workdays in May and all of the workdays in June leading up to Munoz's meeting with Walker and Saine on June 6, 2013.  On these occasions, Saine observed Munoz conducting her personal finances, drafting a resume, writing a memo to friends about being ready to move on, doing personal internet searches, creating promotional materials for a media group operated by her husband, working on a theatrical play, and browsing Craigslist, among other things.  Munoz does not deny any of this, but claims that her personal work did not interfere with her job.  Indeed, when Saine confronted

Munoz about using company time to handle personal business, Munoz was dismissive of his concern, insisting that she could "multi-task."

Shortly before Saine confirmed his suspicion that Munoz was spending a great deal of time on personal matters, instead of doing her work, another incident occurred that, according to Walker, was the "straw that broke the camel's back." On April 1, 2013, a client-broker emailed Munoz, copying Saine, politely asking Munoz whether she had had a chance to send him an executed copy of a lease. She responded that the president of Selig had not yet gotten it back to her, but that she would send him a hard copy and email when that happened. The next day, the broker sent an email to Saine, copying Munoz, asking him to check on the lease. Nothing apparently having happened, on April 15, the broker again emailed Saine and Munoz asking about the lease. Saine responded that Munoz was out, but he thought she had been having trouble finding an original and was going to send the broker another original to sign; Saine said he would check with Munoz when she returned. The next day, Munoz responded by email to Saine as follows:

> I guess you don't remember but you told me that "you" were going to email him and tell him to re-execute, scan, and email it back to us. You were at your computer when we discussed it and said that you'd take care of it. I asked you if you wanted me to and you said NO— you'd just email him. You indicated that is what you were doing at that very moment. Soooooooooo since that email didn't happen, are you saying you now want me to mail him out a hard copy? Please clarify?

Saine responded, "Kendra, I am sorry but I asked you to take care of this."  Munoz replied to her boss:

> Nope, you didn't—at any rate, I WILL take care of it now.  It's back on my desk—to my surprise and I'll handle it. No worries.

Saine responded, "Kendra, I respectfully disagree."  He then forwarded the email chain to Ron Stein as well as to another official at Selig, stating, "This attitude is very upsetting."  Following this incident and Saine's subsequent documentation of Munoz's personal activities on company time, the two men prepared the memorandum in question, dated May 22, 2013, and met with Munoz on June 6 to discuss the memorandum.

### 2.    The Text of the 2013 Memorandum

The 2013 memo whose receipt Munoz refused to acknowledge describes six areas of concern with Munoz's "attitude and work performance":

1) Kendra's defensiveness when questioned about whether there was a misunderstanding about who was to perform a certain task.

2) Kendra's continued excessive tardiness.

3) Kendra's failure to seek Jim and Kent's consent before changing her working hours.

4) Kendra's failure to adequately give Jim and Kent notice when taking extended PTO.

5) Jim and Kent's belief that Kendra spends an excessive amount of the day working on personal affairs.

6)    Jim and Kent's belief that Kendra's attitude has resulted in a difficult work environment that has negatively impacted the department.

None of these items indicate that Munoz would be prohibited from taking future medical leave. Three of the items have nothing to do with leave. The first item concerning Munoz's defensiveness is a reference to the recent email chain in which Munoz had responded disrespectfully to her boss's polite inquiry about the status of a task about which a client was complaining. The fifth item refers to Munoz's insistence on pursuing personal tasks on company time when her supervisors needed her to handle their own work. The sixth item references the difficult work atmosphere that Munoz had created by her negative attitude.

As to the three items relating to attendance issues, the third item indicates concern that Munoz had in the past unilaterally changed her hours without first obtaining the consent of her supervisors; the note by Saine on this point indicates Munoz's change of her start time from 8:15 to 8:30. That concern suggests no prohibition on Munoz's ability to take medical leave. The fourth item indicates Munoz's failure to give her supervisors adequate notice when taking extended paid time off. This was a reference to Munoz having recently given her bosses short notice before taking a week off for her daughter's spring break.[8] Again, nothing to do with medical leave. Although Defendant could not lawfully prohibit Munoz

---

[8] Munoz's explanation for her failure to let her supervisors know well ahead of time about this planned absence was that they knew she always took time off during spring break, and it was essentially up to them each year to figure out, and remember, when that break would occur.

from—or retaliate against her for—taking medical leave, it could legitimately insist that Munoz abide by its procedures for requesting leave, especially leave that was not illness-related.

The final item, Item 2, does express a concern with Munoz's excessive tardiness—and Munoz has indicated that some of her tardies occurred when she was feeling bad in the morning and was therefore late getting to work, albeit other tardies were unrelated to illness. The item does not, however, prohibit Munoz from taking appropriate medical leave.

After listing these six concerns, the memo states, "Kendra was told that the failure to make the necessary changes will lead to further discipline, up to and including termination of her employment." There is then a statement, "The below parties acknowledge receipt of this Memorandum," with a line for Munoz's signature, a line for Walker's signature, and a line for Saine's signature.

Nothing in the text of this short memorandum indicates that, by acknowledging receipt, Munoz agreed with the criticism underlying the list of concerns or agreed that she should be terminated if her supervisors concluded that she had not improved. Certainly, nothing in the memorandum indicates that Munoz was being asked to waive her right to take appropriate medical leave or her right to take any leave otherwise allowed by Selig's leave policies, such as the 20 days PTO allowed each employee each year. Importantly, the signature line

62

indicates only that Munoz acknowledges receipt of the memorandum, not that she

is conceding anything or waiving any right.

### 3.     Legal Analysis of The Memorandum

It is Munoz's argument that, by requiring her to acknowledge receipt of the

2013 memorandum, Defendant was attempting to force her to agree to waive her

right to take any leave in the future, including leave to address medical issues.  It

would be unlawful for an employer to insist on a waiver of FMLA rights as a

condition of employment.  So, if that is what Munoz's signature on the memo

would have accomplished, her refusal to affix that signature would reflect her

unwillingness to accede to her employer's unlawful conduct, and it would be

protected.

Support for Munoz's strained construction, however, is found nowhere in

the text of the memorandum.  Instead,  alleging that during the meeting Saine and

Walker's comments suggested to her that she could never miss another day of

work or ever be tardy again,[9] Munoz offers the meager non sequitur that mere

---

[9]   Such comments might initially suggest a viable FMLA-interference claim.  But as the
majority opinion notes, no interference claim arises because Defendant never actually denied
Munoz any leave to which she was entitled under the FMLA.  *Cf. Batson*, 897 F.3d at 1326–27
(although the record established the employer's intent to deny future accommodations to the
plaintiff, no ADA claim could lie because the plaintiff was fired before further accommodation
was needed).

Similar to *Batson*, even assuming that Saine and Walker's comments suggested that they
would never again permit her to take leave allowed for by the FMLA—which if actually carried
out would mean that Munoz would have a viable FMLA-interference claim—the fact is that
Munoz was never denied any FMLA leave.  Had she simply acknowledged receipt of her

63

acknowledgment of receipt of the memorandum would constitute a waiver of her statutory right to take medical leave.[10]  Yet, no matter the content of the memo, the acknowledgment-of-receipt line of the memorandum indicated only that Munoz had received the document—not that she agreed with anything contained therein or that she waived any right.

Munoz's argument to the contrary flies in the face of the most basic rules of contract construction.  Under Georgia law, the "plain and unambiguous language" of a contract controls its interpretation.  *Unified Gov't of Athens-Clarke Cty. v. McCrary*, 280 Ga. 901, 903 (2006) ("[N]o construction is required or even permissible when the language employed by the parties in their contract is plain, unambiguous, and capable of only one reasonable interpretation.").  *See also State Farm Fire and Cas. Co. v. Bauman*, 313 Ga. App. 771, 773 (2012) ("[W]here an insurance contract contains unambiguous terms excluding coverage, no construction is required, and the plain meaning of the terms must be given full

---

employer's memorandum, she would have kept her job, and then subsequent events would have revealed whether her employer—who had never before denied her any PTO or penalized her in any way for late arrivals or doctor's appointments—was actually intent on denying her leave based on illness.  Instead, Munoz chose to short-circuit this logical development of events by refusing to acknowledge receipt of the memorandum: an action that she knew would result in the termination of her employment.  She now seeks to benefit from that decision by branding as protected conduct what was actually her own recalcitrance.

[10]  The majority opinion states, "Ms. Munoz says her employer <u>essentially</u> told her that she would be waiving her statutorily protected rights by signing the Memorandum . . . ."  Maj. Op. at 31 n.3 (emphasis added). Although it is Munoz's position that she believed this to be the case, I can find no support in Munoz's deposition for this characterization of what her supervisors actually said to her.

effect without straining to extend coverage where none was contracted or intended."). Where contract terms "are clear and unambiguous, the court will look to the contract alone to find the intention of the parties." *Wooden v. Synovus Bank*, 325 Ga. App. 876, 877 (2014) (internal quotation marks omitted). Georgia courts generally do not look beyond the face of a written contract "to add to, take from, or vary" the terms of the contract. *Id.* at 878 (internal quotation marks omitted).

Applying the above legal standards here, the memorandum nowhere indicates that Munoz's signature indicated anything more than an acknowledgement of her receipt of the document. Nothing in the document indicates that, by affixing her signature, Munoz was agreeing with her employer's concerns or that she was waiving any right. Thus, like the plaintiff in *Clover*, Munoz's claimed construction of the document "misses the mark by a country mile." *Clover*, 176 F.3d at 1351.

Particularly as to waiver, Georgia law[11] defines a waiver as the "*voluntary relinquishment* of a *known* right." *Kennestone Hosp., Inc. v. Hopson*, 273 Ga. 145,

---

[11] I cite Georgia law because Defendant's business operated in Georgia, where Munoz worked, and the memorandum was presented to her there. *See Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007) (a "federal court sitting in diversity will apply the conflict-of-laws rules of the forum state") (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)) and *Convergys Corp. v. Keener*, 276 Ga. 808, 812 (2003) (affirming Georgia's continued adherence to the traditional *lex loci contractus* rule). But federal contract law does not differ from Georgia contract law in any respect that is material here. *See In re FFS Data, Inc.*, 776 F.3d 1299, 1304 n.5 (11th Cir. 2015) (noting that state law contract principles and federal common law principles both provide that the plain and ambiguous terms of a contract govern its interpretation) and *Witt v. Metro. Life Ins. Co.*, 772 F.3d 1269, 1279 (11th

148–49 (2000) (emphasis added).  Although it is possible to prove an implied

waiver, an implied waiver must be supported by "decisive, unequivocal conduct

reasonably inferring the intent to waive."  *Id.* (internal quotation marks omitted).

Georgia law does not support inferring a waiver from contractual silence as to

whether a right is waived.  *Id.* at 148–49 ("Ordinarily, silence is insufficient to

establish a waiver unless there is an obligation to speak.").  *See also Mullis v. Bibb*

*Cty.*, 294 Ga. App. 721, 725 (2008) ("Summary judgment is appropriate against a

claim of waiver where there is no evidence that the defendant intentionally or

voluntarily relinquished a known right.").

The shorthand version:  a signatory does not relinquish a known right if

nothing in the document states that she is doing so.  And nothing in the 2013

memorandum indicates that Munoz is waiving any rights.  Lest Munoz complain

that it is not fair to attribute to her knowledge of contract law or the legal principle

of waiver, our caselaw makes it clear that we attribute knowledge of the

substantive law to a plaintiff who is claiming that it was objectively reasonable for

her to believe that her employer was acting unlawfully.  Similarly, the plaintiffs in

*Harper*, *Clover*, *Standard*, *Butler*, *Dixon*, and *Howard* all believed that the

---

Cir. 2014) (explaining that, assuming waiver principles apply to an ERISA claim under federal
common law, such a waiver requires the "voluntary, intentional relinquishment of a known
right" and the "acts, conduct, or circumstances relied upon to show" an implied waiver "must
make out a clear case" (internal quotation marks omitted)).

66

complained-about conduct of their employers violated the law and all were presumably ignorant of the fact that their views did not jibe with the applicable legal standard. See discussion *supra*. Yet, in each of these cases, we held that the plaintiff's beliefs were not objectively reasonable under the prevailing substantive law. Indeed, in *Dixon*, we noted that the plaintiffs there had identified absolutely no legal authority in support of their particular argument: a position in which Munoz likewise finds herself. And those plaintiffs' arguments were a heck of a lot stronger than Munoz's contention here, which is flatly contradicted by the simple, understandable language of the one sentence at issue. Indeed, just like the plaintiff in *Weeks*, who believed that his employer acted unlawfully in insisting that he sign an arbitration agreement, Munoz's purported belief that Defendant acted unlawfully in requiring her to acknowledge receipt of the 2013 memorandum is not an objectively reasonable belief—meaning that her refusal to acknowledge receipt of the document does not constitute protected conduct. To say otherwise would be to engage in the "intellectual dishonesty" decried by *Weeks*. *Weeks*, 291 F.3d at 1316.

And Munoz's argument is further derailed by the fact that she was well aware that her signature acknowledging receipt of a performance memorandum did not indicate any concession or agreement with the contents of the memo. She knew this because she had signed a 2010 memorandum, attesting to her receipt of

it, even though she disagreed with much of what was in that memorandum and clearly did not believe that her signature waived any rights. As a result of that experience, Munoz was aware that she was free to draft her own memorandum setting out her response to her employer's position, just as she had done in 2010. Given this experience with the 2010 memorandum, a person in Munoz's situation could not reasonably have believed that her employer was asking her to waive FMLA rights merely because the employer had merely asked her to acknowledge receipt of a memorandum expressing the latter's concerns. Indeed, the majority opinion has cited no case in which a plaintiff has prevailed on an argument that her particular belief was reasonable where the accuracy of that purported belief is so directly contradicted by the plaintiff's prior experience.

## III.   Why Does This Matter?

A casual reader may wonder why it matters that the majority opinion has recognized this new protected conduct. As long as Munoz is getting to a jury anyway on her retaliation claim on one protected-conduct theory—retaliation based on the protected act of requesting FMLA leave—so what if the majority lobs another theory her way—retaliation based on Munoz's refusal to acknowledge receipt of a performance memorandum? Even if that latter theory seems more than a bit flimsy in its legal and evidentiary foundation, what's the big deal, our reader might ask.

68

As it turns out, it matters a great deal. First, we have long-standing precedent governing this issue. This precedent requires that a plaintiff alleging retaliation must show that she engaged in protected conduct. To show protected conduct, the plaintiff must demonstrate that she not only believed a particular act of her employer was in violation of her statutory rights, but that this belief was objectively reasonable under existing law. If, on this record, we conclude that Munoz could have reasonably believed her refusal to acknowledge receipt of a performance memo constituted a protected act, we will have greatly diluted the objective-reasonableness test and rendered it to be something that is little more than an echo of the subjective-belief inquiry.

None of which is to deny that the dynamics of the June 6 meeting and the accompanying memorandum will be an important part of the jury's inquiry into whether Munoz has made her case on the matter that we unanimously agree constitutes protected conduct: Munoz's notice to Defendant that she would continue to need intermittent leave to address medical issues. The jury will be called on to decide whether Defendant would have fired Munoz had she not provided that notification. The give-and-take between Munoz and her supervisors during the June 6 meeting will be important in figuring out what motivated Defendant's decision to fire her. If the jury concludes that Defendant treated Munoz in a high-handed manner during that meeting or was unresponsive to her

69

concerns, this will be relevant in deciding whether Defendant's stated reason for terminating Munoz—her insubordination in refusing to acknowledge the memo combined with her alleged pattern of combativeness—was merely a pretext to hide its true reason: Munoz's continuing need to take medical leave. Thus, Munoz will be able to fully litigate exactly what happened during this meeting. But if the objective reasonableness issue—which I submit should be decided on this record as a matter of law—is now up for grabs as a jury question, then ill-equipped to gauge that question against substantive caselaw, the jury may mistakenly equate a subjective belief with an objectively reasonable one. And a mislabeling by the jury of Munoz's refusal to acknowledge receipt of the memorandum as protected conduct will essentially constitute a directed verdict for Munoz because Defendant acknowledges that it would not have fired Munoz on June 6 had she simply signed the form. Moreover, this will be the result even if the jury decides that Munoz's alleged request for future medical leave had nothing to do with Defendant's decision to fire her but that instead Defendant fired Munoz entirely because her confrontational, uncooperative attitude had made it impossible to work with her any longer.

Our precedent indicates that when a court can determine that particular conduct is not protected, it should make that call. We fail to honor that precedent with the majority's ruling on this issue. Taking the facts in the light most

70

favorable to Munoz, she did not engage in protected conduct when she refused to

acknowledge receipt of the 2013 memorandum.  We should say so.  We don't and,

for that reason, I respectfully dissent.