[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-13469

_____

JESSICA GRAVES,

Plaintiff-Appellant,

*versus*

BRANDSTAR, INC.,

Defendant,

BRANDSTAR STUDIOS, INC.,

Defendant-Appellee.

_____

2                    Opinion of the Court                    21-13469

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:20-cv-60666-AHS

_____

Before JILL PRYOR, NEWSOM, and GRANT, Circuit Judges.

NEWSOM, Circuit Judge:

Jessica Graves was dealt a tough hand when, in relatively quick succession, her father fell ill and she was let go from her position at Brandstar Studios. Following her termination, Graves sued Brandstar under the Family and Medical Leave Act and the Americans with Disabilities Act. The district court granted Brandstar summary judgment.

Graves presents three arguments on appeal. First, she contends that Brandstar executives interfered with her rights under the FMLA. Second, she asserts that her termination constituted associational discrimination under the ADA. And finally, she claims that the district court improperly weighed the evidence on summary judgment rather than construing the facts in her favor.

After careful review, we conclude that the district court properly granted summary judgment to Brandstar. We affirm.

**I**

**A**

From January 11, 2017 to May 30, 2018, Jessica Graves was an employee of Brandstar Studios—a video-production and

21-13469                Opinion of the Court                3

content-creation company based in Florida. As a "branded content producer/writer," she coordinated onsite shoots, managed editing sessions, and generally shepherded video content from start to finish. According to Graves, from early on in her tenure at Brandstar, her supervisors knew that her father lived in Pennsylvania and was terminally ill. They also knew that Graves was her father's primary caregiver, coordinated medical services for him from afar, and visited him frequently.

On Wednesday, May 2, 2018, Graves received a call that her father had been rushed to the hospital to undergo emergency brain surgery to remove a cancerous tumor. She immediately sent her supervisors at Brandstar the following email:

> Subject: Family Emergency
>
> Hi guys, I'm planning to fly out to see my dad in PA tomorrow morning. My dad is in ICU. I will not be available for calls/edits. Thank you in advance for making any adjustments to my schedule.

Graves flew to Pennsylvania the following day and tended to her father until Sunday, May 6, 2018, when she returned to Florida. A few weeks later, Brandstar executives noticed that Graves had clocked in on Thursday and Friday during her absence. Upon noting this discrepancy, Brandstar's HR team insisted that Graves correct her timecard to reflect the leave. It is undisputed, though, that they didn't inform her that her father's medical emergency might entitle her to benefits under the FMLA.

Upon her return to Florida on May 6, Graves sent Brandstar's CEO the following email, which she later characterized as a formal "show pitch . . . for a Military Makeover show":

> Subject: My Dad
>
> Hi Mark, I just got back from PA where my dad was having emergency brain surgery for a tumor. The aggressive throat cancer that he just finally recovered from last year has metastasized and formed two tumors in his brain. This recent surgery was only able to remove one, the other will need to be treated with radiation and intense chemo and soon.
>
> My dad is a Vietnam Vet who was affected by Agent Orange: He spent his entire career working in the probation and parole system, since retiring he has lived alone in Western PA. He's the kindest, strongest and most stubborn man I've ever known and he's my best friend.
>
> Fortunately, I was able to convince him to let me find the best oncologists and radiologists in South Florida for this next and hopefully final round of treatment, but I will need to move him down here asap. Since the last treatment resulted in pneumonia which required a portion of his lung to be removed and feeding tube chest port to be put in. He nearly died twice. The reason I'm telling you this is because I'm hoping you can help.

21-13469                 Opinion of the Court                          5

> I have a 2-car garage that I need to convert into a studio apartment and I know that between Ryan/Russ/Edwin/Vince they could knock this out in a few days.
>
> I am hoping you'll see the benefit in allowing them a few days to do this within the next couple weeks since we can also turn this into a local Military Makeover UFP. There are a few companies I can reach out to for materials to help, but I am prepared to pay for everything myself, including labor. All I need from you is permission to 'borrow' the guys.
>
> I'm around if you want to give me a call otherwise we can discuss Monday. I'm going to be driving him and his beloved dog down to FL once he's released from rehab to begin treatments.

Graves also verbally requested to be excused from work-related travel and staffed only to local shoots as she prepared her home for her father's move to Florida. Again, it is undisputed that no one at Brandstar told Graves that her father's condition and her role as his caretaker might entitle her to FMLA benefits.

On May 25, 2018, Graves arrived late to work and was escorted into a meeting with her supervisor, a studio manager, and an HR assistant. During the conversation, they suggested that Graves transition from her full-time role to a freelance position because it might better suit her schedule. Graves declined the offer and asked whether this had to do with her father, to which the Brandstar executives answered that it didn't. At that point, they

6                    Opinion of the Court                    21-13469

decided to let Graves go effective May 30, 2018.  Her father moved to Florida three months later.

Graves's employment record was mixed.  She had a history of "coming and going"—a practice that rankled her supervisors. She also often missed editing sessions for her projects without notice.  Once, Graves left a junior editor waiting on her for an hour until her supervisor contacted her to ask if she planned to attend. And long before her father's surgery, Graves's supervisors repeatedly reported that her performance was subpar, that her projects often went incomplete, and that her attitude at work made it difficult to collaborate.

**B**

Following her termination, Graves sued Brandstar in federal court.  As relevant here, Graves alleged that Brandstar (1) interfered with her rights under the Family and Medical Leave Act and (2) engaged in associational discrimination in violation of the Americans with Disabilities Act.  After the district court granted summary judgment to Brandstar, Graves appealed to this Court.[1]

---

[1] We review a district court's grant of summary judgment de novo, construing all facts in the light most favorable to the non-moving party—here, Graves. *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1272 (11th Cir. 2020).  Summary judgment is warranted when there are no genuine disputes of material fact. *Smith v. Owens*, 848 F.3d 975, 978 (11th Cir. 2017).

## II

Graves presents three arguments on appeal. She contends that the district court (1) misapplied the FMLA in rejecting her claim that Brandstar failed to provide adequate notice of her statutory rights, (2) wrongly rejected her ADA associational-discrimination claim, and (3) improperly weighed the evidence when considering Brandstar's summary-judgment motion. We will consider each in turn.

## A

Graves first contends that the district court incorrectly rejected her contention that Brandstar failed to provide her the required notice of her FMLA rights. The FMLA provides up to 12 weeks of leave for an employee, like Graves, who is responsible for caring for a family member with significant medical needs. *See* 29 U.S.C. § 2612(a)(1)(C). To recover on an "interference" claim under the FMLA, a plaintiff must satisfy three elements. First, she must show that she was entitled to a benefit under the FMLA. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). Second, she must show that her employer denied her that benefit. *Id.* And finally, she must "demonstrate harm, or prejudice, resulting from the employer's interference with her exercise (or attempted exercise) of an FMLA benefit." *Ramji v. Hosp. Housekeeping Sys., LLC*, 992 F.3d 1233, 1245 (11th Cir. 2021).

As to the first element, it's undisputed that Graves was eligible for FMLA benefits because she had worked full-time at Brandstar for more than 12 months prior to the events giving rise to her

appeal and was charged with caring for a parent who had a serious health condition. *See* 29 C.F.R. § 825.110; *see also* 29 U.S.C. § 2612(a)(1)(C).

That brings us to the second element—whether Brandstar denied Graves her benefits under the FMLA. Graves contends that Brandstar failed to provide her notice of certain statutory rights—a failure, she says, that amounts to actionable interference with her FMLA benefits. Under the FMLA and its implementing regulations, there are several kinds of notice that an employer must provide—at different junctures and in different circumstances. *See* 29 C.F.R. § 825.300. The two at issue here are "[e]ligibility notice" and "[r]ights and responsibilities notice." *Id.* § 825.300(b)–(c). The former, as its name implies, "must state whether the employee is eligible for FMLA leave," *id.* § 825.300(b)(2), and the latter must "detail[] the specific . . . obligations of the employee and explain[] any consequences of a failure to meet these obligations," *id.* § 825.300(c)(1).

Importantly for present purposes, it doesn't take much to trigger an employer's obligation to provide both kinds of notice. The operative regulation states that an employer must provide an employee with eligibility and rights-and-responsibilities notice when *either* (1) "an employee requests leave" *or* (2) "the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason." *Id.* § 825.300(b)(1) (eligibility notice); *see id.* § 825.300(c)(1) (stating that rights-and-responsibilities notice "shall be provided to the employee each time the eligibility notice is

provided"). Accordingly, if the employer learns from any source—whether from the employee or otherwise—that the employee's leave might be for family or medical reasons, it is obligated to provide both types of notice.

Graves contends that she sought FMLA-qualifying leave on two occasions that triggered Brandstar's notice obligations: (1) her May 2 email requesting leave for a short trip to care for her father while he underwent emergency surgery; and (2) her May 6 email and subsequent verbal communications requesting to be excused from work-related travel. We consider each in turn.

**1**

In the May 2 email, Graves told Brandstar executives that she intended to fly to Pennsylvania for her father's emergency brain surgery the next day and would "not be available for calls/edits" while she was with him. We agree with Graves that her email was sufficient to trigger Brandstar's obligation to provide her eligibility and rights-and-responsibilities notice under the FMLA because Brandstar "acquire[d] knowledge that [her] leave may be for an FMLA-qualifying reason." *Id*. § 825.300(b)(1). It is undisputed that Brandstar failed to provide Graves the required notice following the May 2 email.

Brandstar's failure to notify Graves of her FMLA rights may well have interfered with her exercise of the corresponding benefits within the meaning of the second prong of the interference analysis. *See supra* at 7. But that failure alone isn't enough to survive summary judgment. To recover on her interference claim, Graves

must also—prong three—show that Brandstar's failure caused her harm. *See Ramji*, 992 F.3d at 1245; *accord, e.g.*, *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1274–75 (11th Cir. 2020) (citing *Graham v. State Farm Mut. Ins.*, 193 F.3d 1274, 1284 (11th Cir. 1999) (per curiam) ("Even if the defendants have committed certain technical infractions under the FMLA, [a] plaintiff may not recover in the absence of damages.")). Under our precedent, an employee doesn't suffer harm from an employer's technical non-compliance with the FMLA's notice requirements when she receives all her requested time off and is paid for her absences. *Munoz*, 981 F.3d at 1275.

The parties agree that Brandstar provided Graves the leave she requested in her May 2 email and that she received full pay for those days. In fact, Graves accidentally clocked in on her two days of requested leave, and Brandstar HR executives circled back weeks later to ensure that she corrected her timecard to reflect her requested leave. Thus, Graves can't demonstrate that she was harmed by Brandstar's technical failure to notify her of her FMLA rights. As a result, we must reject her interference claim arising out of the May 2 request for leave.

**2**

Graves separately contends that her May 6 email—in which she asked for ongoing flexibility to prepare her home for her father's move to Florida—triggered Brandstar's obligation to provide her eligibility and right-and-responsibilities notice, which it failed to do. We disagree for a fundamental reason: Graves didn't request

leave either in her May 6 email or in her subsequent communications with Brandstar.

The Family and Medical *Leave* Act requires, at the very least, that an employee actually seek leave—of some sort—to trigger an employer's obligation to give eligibility and rights-and-responsibilities notice. As already explained, the operative notice regulation requires either that an employee specifically "request[] FMLA *leave*" or that the employer "acquire[] knowledge that an employee's *leave* may be for an FMLA-qualifying reason." 29 C.F.R. § 825.300(b)(1) (emphasis added). That regulation, as we have said, sets a low bar, but in either triggering instance, the employee must ask for time off—*i.e.*, leave—in order to prompt the employer's notice obligations. *See, e.g.*, *Ramji*, 992 F.3d at 1243–44 (holding that an employer was obligated to give an employee notice of her rights under the FMLA when she had clearly asked for sick leave to recuperate her injured knee).

An examination of the May 6 email reveals that Graves didn't ask for leave—of any sort—to care for her ailing father. To the contrary, her message unambiguously discussed ongoing and future work with Brandstar, which included developing a show around her father's transition to Florida. So, if anything, Graves's father's medical needs, in her view, presented new opportunities for work, not reasons for leave. True, Graves asked to be staffed on local projects to assist with her father's transition to Florida. But at most, those amounted to requests for accommodations to allow her to continue to work, not a request for leave. Her rejection of

Brandstar's offer to move from full-time to freelance also evidences her desire to continue working. Put simply, all signs point to the fact that Graves intended to keep working full-time at Brandstar, not that she wanted leave.[2]

Moreover, not only did Graves fail to "request leave" in the May 6 email, but there's also no indication that Brandstar "acquire[d] knowledge" on its own that she wanted "leave . . . for an FMLA-qualifying reason." 29 C.F.R. § 825.300(b). Therefore, Graves's email didn't trigger Brandstar's obligation to notify her of her eligibility and rights and responsibilities under the FMLA. We conclude that the district court didn't err in granting summary judgment to Brandstar on Graves's FMLA claim.

---

[2] In the final sentence of her email, Graves mentioned that she had planned to "driv[e] [her father] and his beloved dog down to FL once he[ was] released from rehab to begin treatments." Even if we were to assume that sentence implied a request for leave and that Graves's proposal constituted "care" within the meaning of the FMLA, *see* 29 U.S.C. § 2612(a)(1)(C), her claim would fail on the same ground that precludes her FMLA claim related to the May 2 email: Graves can't show harm resulting from any technical non-compliance with the FMLA's notice regulation because her father didn't move to Florida until three months after she was let go. *See supra* at 7.

**B**

Graves next contends that the district court erred in granting summary judgment to Brandstar on her associational-discrimination claim.

Under the ADA, an employer is prohibited from discriminating against an employee who is "associated" with someone who has significant medical needs for whom the employee may need to provide care. 42 U.S.C. § 12112(b)(4). We evaluate a claim of associational discrimination under the ADA using the burden shifting-framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001).

In the absence of direct evidence of discrimination, the employee bears the initial burden to show a prima facie case of discrimination. *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999). Once the employee has done so, the employer need only produce evidence of a legitimate, nondiscriminatory reason for its decision. *Wascura*, 257 F.3d at 1242. The burden then shifts back to the employee to show sufficient evidence to create a genuine issue of material fact that the employer's stated reason is pretextual. *Id.* at 1243. If the employee can't carry that burden, then the employer is entitled to summary judgment. *Id.*

We will assume *arguendo* that Graves has made out a prima facie case and move to the second and third prongs of the *McDonnell Douglas* analysis. On the second prong, Brandstar proffers ample evidence that Graves was fired because of her haphazard

attendance, poor communication, incomplete work, and difficult work demeanor.

By contrast, Graves offers little to no argument—in either her initial or reply brief—to carry her burden on the third prong. What we said in *Wascura* applies here foursquare: Graves "has failed to adduce sufficient evidence from which a reasonable jury could find that [Brandstar's] proffered, non-discriminatory reasons for her termination were pretextual." 257 F.3d at 1243. The only evidence she marshals is the "temporal proximity" between her father's acute onset decline and her termination—which, as we've previously held, isn't enough to show pretext. *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1138 n.15 (11th Cir. 2020) (en banc) ("While close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient."). Thus, the district court properly granted summary judgment to Brandstar on Graves's ADA claim.

## C

Lastly, Graves contends that the district court improperly weighed the evidence rather than viewing it in the light most favorable to her when deciding Brandstar's summary-judgment motion. Our review here is de novo, *Munoz*, 981 F.3d at 1272, and "we may affirm the district court's judgment on any ground that finds support in the record," *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quotation marks omitted). Having concluded that the record supports the district court's grant of

summary judgment to Brandstar on both the FMLA and ADA claims, we needn't separately address this issue.

### III

For the foregoing reasons, we affirm the district court's decision granting summary judgment for Brandstar.

**AFFIRMED.**