[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-11489

Non-Argument Calendar

————————————————

RED DOOR ASIAN BISTRO,
ANTONIO ASTA,
ZHI YU LIU,

Plaintiffs-Appellants,

*versus*

CITY OF FORT LAUDERDALE,
CHIEF MECHANICAL INSPECTOR, CITY OF FORT
LAUDERDALE,

Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cv-61308-RKA

_____

Before ROSENBAUM, GRANT, and ANDERSON, Circuit Judges.

PER CURIAM:

In this 42 U.S.C. § 1983 civil-rights case, an Asian-fusion restaurant (Red Door Asian Bistro) and its owners, Antonio Asta and Zhi Yu Liu (collectively, "Red Door"), allege that Robert Gonzalez, the City of Fort Lauderdale's former Chief Mechanical Inspector, violated their equal-protection rights by refusing, for racially discriminatory reasons, to pass on inspection a kitchen hood at their restaurant. The district court granted summary judgment to Gonzalez on that claim, finding that it failed for lack of proof of a similarly situated comparator. Because we hold that a comparator is not essential for the plaintiffs to prevail on their equal-protection claim, we vacate and remand for further proceedings on that claim. We affirm the district court's judgment in all other respects.

**I.**

Asta and Liu are restaurateurs and business partners. In September 2017, they decided to open Red Door in Fort Lauderdale, after owning and operating several restaurants on Long Island. They rented a vacant restaurant space on Las Olas Boulevard and hired a local architect and contractor, Joseph Dobos, to design and

renovate it. Dobos developed and submitted plans to the City, and he obtained the necessary permits to begin work in January 2018.

A. *The "zero clearance" kitchen exhaust hood*

The renovation project included the installation of a new kitchen exhaust hood. The hood design plan was created by an engineer named Raja Buchanan, working with a company called Hood Depot.

The new kitchen hood was a "zero clearance" hood manufactured by CaptiveAire. Building code ordinarily requires at least 18 inches between a hood and any "combustible material," but that ordinary "clearance" may be reduced, even to zero. To achieve zero clearance, CaptiveAire included insulation boards from Owens Corning, a supply company, on the exterior of the hood to act as a thermal barrier between the hood and any combustible material. The entire hood assembly was "ETL listed," meaning that the product had been tested and certified for the intended application by Intertek, an independent product-safety company.

B. *The City begins inspections, and an impasse arises.*

The City began inspections at the restaurant in February 2018. Over several inspections as work progressed, the Fire Department, electrical inspectors, and other mandatory City inspectors passed the renovation work for final inspection. Everything went smoothly except for the kitchen hood permit, which remained in limbo until August 2018.

The permit for the kitchen hood was overseen by Chief Mechanical Inspector Gonzalez and his subordinate, Inspector Andres Vera. Gonzalez and Vera conducted initial inspections at the restaurant in early February 2018 and made several "courtesy visits" in March and April 2018.

At the initial visit, Vera expressed concern about the insulation material used for clearance reduction on the exterior of the kitchen hood. Gonzalez and Vera raised similar concerns about the exterior insulation material during three or four follow-up visits through the end of April 2018. The gist of the inspectors' position was that Red Door needed to use a different insulating material for clearance reduction on the exterior of the kitchen hood.

Red Door viewed the inspectors' demands as fundamentally misguided, since the problematic insulating material was a manufactured component of the kitchen hood assembly, which was ETL listed for its intended zero clearance application. Red Door also believed that retrofitting the hood with different insulation would void the warranty from CaptiveAire and pose a potential fire hazard.

Seeking to resolve the impasse, Red Door reached out to CaptiveAire, the hood's manufacturer. It appears CaptiveAire spoke to Gonzalez about the hood on or around April 26, 2018. Red Door also obtained a letter from CaptiveAire dated April 24, 2018, which stated that the kitchen hood was designed and listed for zero clearance, as shown on labels on the inside of the hoods,

under an ETL listing which the City "should have the ability to look up."

In addition, Dobos sought help from Rolando Soto, the Chief Mechanical Code Compliance Officer for the Broward County Board of Rules and Appeals ("BORA"), which was separate from the City and oversaw building-code enforcement. Soto's response vaguely referred to excerpted sections of the building code.

Finally, Dobos pushed the City to issue a "Correction Notice" or red tag as a way of getting the City to articulate in writing its grievances with the kitchen hood.

## C. *Gonzalez injects racial invective into the dispute.*

When the impasse arose over the kitchen hood, Gonzalez resorted to racist invective and bullying.[1] According to Asta, his business partner Liu is a native of China who was educated there before immigrating to the United States.

Early in the construction process, Gonzalez announced in the presence of Asta and Liu: "I am in charge here. We do things different from what you get away with in New York. I know all

---

[1] As a reminder, in reviewing whether summary judgment was proper, we construe the evidence "in the light most favorable to the non-moving party—here, [Red Door]." *Graves v. Brandstar, Inc.*, 67 F.4th 1117, 1120 n.1 (11th Cir. 2013). The actual facts may or may not be as we've summarized them for purposes of evaluating the order granting summary judgment. Gonzalez denied making statements he "understood to be derogatory toward Asians," notwithstanding an apparent clerical error in his declaration.

about how these Chinese guys do things.  No chink from New York is going to tell me how to do my business."

And Gonzalez made that same sentiment clear throughout the construction process, regularly expressing disdain for Liu's heritage and race.  Such comments included the following: (1) "What does this chink think he is doing here?"; (2) "what does this chink know?"; (3) "There is a reason we don't have many chinks trying to open"; (4) "Las Olas is not China Town"; (5) "Does that Chinaman believe he knows more than me?"; (6) "I don't know what kind of business that guy does, but we do things different in America"; (7) "How long has he even been here?"; (8) "He should go back to Hong Kong where he belongs"; (9) "he should go back to China, this isn't how we do things in America"; (10) "This junk [referring to the kitchen hood] might pass in China, but this is not a Third World country"; (11) "doesn't he even understand English?"; (12) "Where is this guy from?"; (13) "I love working with these Chinese. They think money buys everything. But he's got another thing coming"; (14) "what does he know, this chink, what is he talking about, this is not how we do stuff here in Florida"; and (15) "these chinks cannot come into our town and think they are going to own us and do whatever they like.  This is the wrong hood." Not only that, but on one occasion Gonzalez "slanted his eyes when referring to Liu and the Red Door."

Gonzalez also made clear that he "call[ed] the shots."  He claimed that the Chief Building Officer "assigned" decisions to him, and that "no one overruled [him]" when it came to mechanical

permits. He told Asta that he was in contact with Soto of BORA, and that any appeal of Gonzalez's decisions to BORA would be futile because Gonzalez had already "taken care of that." Gonzalez, according to Asta, explained that he "was the law, the policy, and the process for the City if we ever expected to do business in Fort Lauderdale."

*D. The City fails the kitchen hood permit and requires correction.*

On April 30, 2018, Vera issued a correction notice for the kitchen hood, the only renovation project remaining. The notice advised that the "[m]aterial used for clearance reduction on the hood is not UL approved for that application" and needed to be changed. Red Door retained an attorney, who scheduled a meeting with City officials and, on May 2, 2018, provided a letter from CaptiveAire confirming that the kitchen hood was ETL listed for zero clearance installation.

The following week saw a flurry of activity between the City and Red Door. On May 3, Red Door representatives met with City officials, including Gonzalez, Vera, and Chief Building Official John Travers, to discuss the exterior insulation material on the hood. That same day, Vera obtained a letter from David Burd of Owens Corning, who stated that the insulation material used in the kitchen hood was not recommended "for this specific application" and provided an alternative recommendation. Vera forwarded the letter to Gonzalez and Travers, who sent it to Red Door's attorney and stated that he was "obligated to hold the final inspections on the hood installation until such time as the modifications are

completed, using a more appropriate product, as recommended by Owens Corning."

In response, on May 5, 2018, Red Door provided Travers more information about the kitchen hood, "including engineering certifications and the results of laboratory testing." Red Door also immediately followed up with Owens Corning and Burd, who retracted his prior comments in a second letter dated May 7, 2018. Burd wrote that he lacked the following two key pieces of information when he issued the May 3 letter: (1) the Owens Corning product was a "component of a commercial kitchen hood assembly manufactured by CaptiveAire," not a retrofitted installation, as he had been led to believe; and (2) "CaptiveAire has had this assembly tested and certified by Intertek — (ETL) as an acceptable assembly in a zero-clearance application." Based on that information, Burd stated, Owens Corning "has no issue with the use of [its product] in this CaptiveAire application."

*E. Another inspector passes the kitchen hood.*

Seeking an outside perspective, Chief Building Official Travers scheduled another mechanical inspector, Tony Sedoff, to reinspect the work on the kitchen hood permit on May 8, 2018. Travers accompanied Sedoff to the restaurant, where Sedoff quickly passed the work after confirming what Red Door had maintained all along—that the kitchen hood was ETL listed for zero clearance applications. Sedoff simply "checked the plan and the model number," which matched the hood, and verified that the hood assembly had a zero clearance rating.

That's consistent with Buchanan's testimony that, since the hood was a listed product, there was no reason to further question its qualifications. Neither Sedoff nor Travers were aware of any other issue with the hood at that time and, according to Sedoff, Gonzalez never gave a valid explanation as to why he and Vera had failed the kitchen hood.

During the May 8 inspection, Asta told Sedoff and Travers that Gonzalez had been making "derogatory comments about my partner and stuff like that, like what he knows, and does he even speak English, stuff like that." And Dobos, complaining about the delays, likewise stated that Gonzalez had "it in for [Liu]" and had "said some off the wall remarks about his race." Sedoff and Travers just "kind of laughed it off" and "really [didn't] want to hear it," according to Asta.

Once Sedoff passed the work on the kitchen hood, the City removed the correction notice, closed out all permits, and issued the requisite occupational license needed for the restaurant to open. The restaurant opened for business soon after, on or around May 12, 2018.

*F. The City reopens the kitchen hood permit.*

But Red Door's relief was short-lived. When Asta arrived at City Hall to collect the occupational license, Gonzalez came up to him and said in a "threatening and intimidating manner and tone intended to be heard only by [Asta]: 'You win. You win. You think you win. We will see how long you stay open. Let me be clear – you are not going to win.'" Gonzalez "smirked and stated in an

apparent attempt to mimic and mock a Chinese accent, 'Your boss should go back to China Town. We don't need chinks here.'"

Then a new obstacle arose.  On May 9, 2018, Chief Mechanical Code Compliance Officer Soto sent an email to Gonzalez and Travers, among others, referencing Dobos's earlier complaint about the delays and Gonzalez and stating that, after speaking with Vera, there appeared to be a "misunderstanding about what is the issue."  According to Vera, Soto wrote, the "issue is not the hood clearance rating.  The issue is the hood penetrating a fire rated ceiling."  With regard to the hood clearance rating being a non-issue, Soto excerpted an email from CaptiveAire dated April 26, 2018, which referenced a conversation with Gonzalez and stated that CaptiveAire "tested *this specific insulation* to zero inches" in compliance with the "UL-710" fire-safety standard, in conditions "less severe" than the Red Door jobsite.

Travers responded to Gonzalez and Soto soon after, stating that the kitchen hood assembly "appears to be compliant for the installation" and that any further discussion on the compliance of the assembly should be directed to Sedoff.  Soto then asked to meet with both Gonzalez and Sedoff.

Several days later, on May 15, 2018, Sedoff arrived for a "meeting" at Gonzalez's office.  Soto and another BORA member, Ken Castronovo, said that they "wanted to investigate [Sedoff] about why [he] passed the inspection" and insisted that the interview be recorded.  They told Sedoff that someone had complained that he passed the inspection, but they refused to identify the

person or to explain the complaint unless Sedoff agreed to be recorded. When Sedoff refused, Castronovo warned him that "if [he's] guilty, [he's] screwed]." They did not ask him about the inspection. Sedoff then summarized these events in an email to Gonzalez, Soto, Travers, and others, writing that the situation was "handled extremely unprofessional[ly]."

Later that day, Sedoff wrote to Travers that he was "extremely irritated by this entire situation," and he asked Travers "to 'fail' the mechanical inspection" and send the prior inspector. Sedoff testified that he had never seen anything like it in more than 50,000 inspections. After meeting with Sedoff, Travers changed the status of the hood permit from passed to canceled on May 16, 2018.

Meanwhile, also on May 16, 2018, Soto notified Gonzalez and Travers by email that, after interviewing them both, he and Castronovo had concluded that Gonzalez did not violate the powers and duties of his position as Chief Mechanical Inspector with respect to Red Door. Soto added, "This conclusion doesn't relieve the fact that the Type 1 grease hood installed at this location under [the permit] is, to the best of our knowledge, in violation of sections 507.2.7 Type I hoods penetrating a ceiling and 506.3.11 Grease duct enclosures of the 2017 Florida Building Code - Mechanical, Sixth Edition. Corrective action has to be taken by the Building Department."

The record fails to reveal with any clarity when the hood penetration issue arose or what the purported problem was.

Gonzalez and Vera both proffered declarations with the same vague story, which went like this:

During one of the courtesy visits in March or April 2018, before the red tag was issued, Gonzalez and Vera were "able to inspect the installation of the Hood as it related to the ceiling." Based on that inspection, "it appeared to [them] that the Hood was penetrating the ceiling which was fire rated," which they "did not believe . . . to be in compliance with the plans approved by the City for the Hood." They based that belief "on [their] visual inspection of the Hood installation, [their] review of the approved plans for the Hood, and [their] years of training and experience" as mechanical inspectors.

Neither inspector said that they raised this issue during the courtesy visits, however. Nor was it raised in the subsequent correction notice on April 30 or during the meeting at Red Door on May 3, which Gonzalez and Vera both attended.[2]

For his part, Red Door's contractor Dobos confirmed that the kitchen hood installation included "get[ting] the hood to go through the roof" and "mak[ing] sure that everything was fire rated properly." When questioned at his deposition about the hood penetration issue, though, Dobos stated that it had been fully addressed and "was never an issue," noting it was "not what we were cited for." Dobos explained that the duct going from the hood to the roof had been enclosed with "5/8th's fire rated drywall" and

---

[2] The record does not contain the deposition of either Gonzalez or Vera.

"caulked with fire caulking," which "the fire inspector inspected and had no issues with."

G.  *Red Door finally passes inspection with no changes.*

In the wake of the permit cancellation, Red Door's attorney sought meetings with City building officials, advising that Buchanan, the engineer for the kitchen hood installation, had told him that the hood was "installed according to his design and no corrections are needed." In the meantime, the restaurant was allowed to keep operating, but Red Door did not advertise extensively or have a grand opening for fear of being shut down at any moment.

Red Door representatives and Buchanan arranged to meet with Travers on June 8, 2018, but when they arrived, the City canceled the meeting. As they were leaving, according to Asta, "Gonzalez remarked on the absence of Liu and made another caustic, racially disparaging comment about Liu being Chinese." The meeting was rescheduled for June 13, 2018, but then canceled again by the City. Travers did not respond to a follow-up email from Red Door's attorney asking about next steps and requesting Gonzalez's recusal due to his "bias and unfair treatment."

In early July 2018, without hearing from City building officials, Red Door's attorney wrote to the Mayor and the City Manager requesting a meeting to bring the dispute to a close. Red Door again requested Gonzalez's recusal but did not expressly reference any anti-Asian comments.

This letter eventually prompted a meeting at the restaurant in early August 2018 between Red Door representatives and

14              Opinion of the Court              22-11489

various City officials.  The City "ultimately agreed with the Plaintiffs that the Hood had been properly installed in accordance with the approved plans and the Florida Building Code."  At the City's request, Buchanan provided a letter certifying that the kitchen hood was installed per the plans and in a safe manner.  Accordingly, the City finally closed out the permit with no changes.

## II.

In May 2019, Asta, Liu, and Red Door sued the City and Gonzalez under 42 U.S.C. §§ 1983 and 1988, alleging violations of their constitutional rights to due process and equal protection. They filed the operative second amended complaint in May 2020. Only the equal-protection claim is at issue on appeal.[3]

The City and Gonzalez moved for summary judgment. They argued that the equal-protection claim failed because Gonzalez was not the decisionmaker as to the alleged acts of discrimination, Red Door had not identified any similarly situated comparator that was treated differently, there was no basis for municipal liability, and Gonzalez was entitled to qualified immunity.  Responding in opposition, Red Door maintained that genuine issues of material fact precluded summary judgment.

---

[3] With regard to the due-process claim, the district court granted the City's motion to dismiss and Gonzalez's motion for summary judgment.  Red Door does not challenge either decision on appeal, so it has abandoned those issues. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (issues not raised on appeal are deemed abandoned).

The district court granted summary judgment for the defendants. As to Gonzalez, the court found that he was entitled to qualified immunity. In the court's view, Red Door failed to present any evidence of a valid comparator who was treated more favorably. The court questioned whether such a showing was necessary, stating that it "might have found that foundational equal-protection principles create a cause of action whenever an official's actions are motivated by racial animus." But it concluded that binding circuit precedent required a plaintiff in selective-enforcement cases to "present a similar situated comparator to withstand summary judgment." "Given this precedent," the court stated, it could not "say that Gonzalez violated the Plaintiffs' 'clearly established' equal-protection rights." As to the City, the district court concluded that there was no basis for municipal liability because Gonzalez was not a final policymaker, and no final policymaker ratified his conduct. This appeal followed.

### III.

"We review a district court's grant of summary judgment *de novo*, construing all facts in the light most favorable to the non-moving party—here, [Red Door]." *Graves v. Brandstar, Inc.*, 67 F.4th 1117, 1120 n.1 (11th Cir. 2013). "Summary judgment is warranted when there are no genuine disputes of material fact." *Id.*

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. art. XIV, § 1. Broadly speaking, "the Equal Protection Clause requires

government entities to treat similarly situated people alike." *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1313 (11th Cir. 2006). Its "central purpose," though, "is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976).

The Equal Protection Clause protects against race discrimination on the face of a statute, in the enactment of a statute, and in the application of a facially neutral statute. *See id.* at 241 ("A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race."). Unequal application of facially neutral rules can result from either "misapplication (i.e., departure from or distortion of the law) or selective enforcement (i.e., correct enforcement in only a fraction of cases)." *E & T Realty v. Strickland*, 830 F.2d 1107, 1113 (11th Cir. 1987).

Either way, "ordinary equal protection standards" require a plaintiff to show that the challenged conduct "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985); *see Jones v. Bd. of Comm'rs of Ala. State Bar*, 737 F.2d 996, 1003 (11th Cir. 1984) ("[P]roof of discriminatory purpose is required to show a violation of the equal protection clause."). Unlawful discriminatory purpose may be shown directly or "inferred from the totality of the relevant facts." *Washington*, 426 U.S. at 242; *see Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) ("A plaintiff may use either direct evidence or circumstantial evidence to show race discrimination."). Probative evidence may include racially biased comments, better treatment

of similarly situated persons outside the plaintiff's class, or pretext in the justification offered for the official action. *See Jenkins*, 26 F.4th at 1250–51 (concerning race discrimination in employment).

As the district court correctly recognized, our precedent holds that a plaintiff alleging a *selective-enforcement* equal-protection claim must "show disparate treatment *compared to a similarly situated party*, whether [he or she] is alleging discrimination based on a suspect classification or under a 'class of one' theory." *Young Apts., Inc. v. Town of Jupiter, Fla.*, 529 F.3d 1027, 1045–46 (11th Cir. 2006) (emphasis added); *see also Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996) ("[I]t must be establish[ed] that: (1) the plaintiff was treated differently than similarly situated persons; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff.").

That comparator requirement makes sense given the nature of a selective-enforcement claim, which stems from "correct enforcement in only a fraction of cases." *E & T Realty*, 830 F.2d at 1113. Thus, the issue is whether the plaintiff was unfairly targeted for correct enforcement, not whether the reasons offered for the official action were valid or genuine. *See id.* And in those circumstances, evidence of discriminatory motive alone does not establish a discriminatory effect—that is, that the defendants applied the law unequally. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1216 (11th Cir. 2008) ("[E]vidence that . . . city officials are biased against recovering substance abusers is irrelevant absent some indication that the recoverers were treated differently than non-recoverers.").

Rather, establishing a discriminatory effect necessarily requires a more direct comparison to others, because "[w]ith selective-enforcement claims like this, evenhanded application of the law is the end of the matter." *Id.* at 1217; *see also Strickland*, 74 F.3d at 265 ("Different treatment of dissimilarly situated persons does not violate the Equal Protection Clause.").

Nevertheless, this case is not a selective-enforcement case, so the analysis is not necessarily the same. *See Schwarz*, 544 F.3d at 1217 (noting that different equal-protection claims may require different analyses); *see also Awabdy v. City of Adelanto*, 368 F.3d 1062, 1071 (9th Cir. 2004) (declining to apply the strict comparator requirement outside the context of a selective-prosecution claim, such as where the plaintiff challenged the validity of the reasons for the action taken against him); *Pyke v. Cuomo*, 258 F.3d 107, 109 (2d Cir. 2001) (limiting the comparator requirement to selective-prosecution cases).

Rather, this case is better characterized as alleging "misapplication (i.e., departure from or distortion of the law)," rather than "selective enforcement (i.e., correct enforcement in only a fraction of cases)." *E & T Realty*, 830 F.2d at 1113. The crux of the plaintiffs' claim is that Gonzalez departed from the building code based on anti-Asian animus by fabricating problems with Red Door's new kitchen hood. In other words, they allege that Gonzalez did not correctly enforce the law but rather refused to correctly apply it because of anti-Asian animus.

And unlike selective-enforcement cases, proof of a similarly situated comparator is not necessary for Red Door to establish the core elements of an equal-protection claim: (1) a discriminatory motive; and (2) a discriminatory effect. *See Wayte*, 470 U.S. at 608; *see also Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("Not every [person] subjected to unlawful discrimination will be able to produce a similarly situated comparator.").

If a jury found that Gonzalez failed or impeded inspection of the kitchen hood for bogus reasons and that his true reason was racial animus, it could reasonably conclude that his conduct "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte*, 470 U.S. at 608. Under that view of the facts, Red Door was treated worse and subjected to illegitimate delays and costs because Gonzalez departed from the ordinary building code due to anti-Asian animus. Analytically, that is no different than if Gonzalez told Red Door it was failing them because they were Asian owned. That is the essence of disparate treatment. *See Int'l B'hood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) ("disparate treatment" means "treat[ing] some people less favorably than others because of their race"). And preventing such official conduct based on race is at the core of the equal-protection guarantee. *See Washington*, 426 U.S. at 239. Requiring a more direct comparison with a similarly situated party in these circumstances would unnecessarily frustrate that guarantee.

For these reasons, we hold that Red Door's equal-protection claim against Gonzalez does not fail for lack of a proper

comparator.[4] So, the district court erred in dismissing the claim for that reason.

## IV.

A few other issues remain to be resolved. First, Gonzalez asserts the defense of qualified immunity. But it need hardly be said that a City official using the permit process to intentionally discriminate based on race violates clearly established law. *See Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1218 (11th Cir. 2005) ("Of course, the Equal Protection Clause prohibits a state from using a facially neutral law to intentionally discriminate on the basis of race."); *see also Smith v. Lomax*, 45 F.3d 402, 407 (11th Cir. 1995) ("We need not engage in a lengthy discussion of the patently obvious illegality of racial discrimination in public employment at the time the appellants voted to replace Smith."). Preventing such discrimination is the central purpose of the equal-protection clause. *See Washington*, 426 U.S. at 239. That there may have been some uncertainty about whether the Red Door plaintiffs were required to prove a similarly situated comparator does nothing to suggest

---

[4] We disagree with the district court and Gonzalez that Red Door failed to properly raise this issue below. At summary judgment, Red Door argued that it established a "convincing mosaic" of race discrimination based on the totality of the record evidence, citing our employment-discrimination caselaw. *See, e.g.*, *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("[A] plaintiff will always survive summary judgment if he presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." (cleaned up)). Under that framework, the failure to "produce a similarly situated comparator" is not fatal to a discrimination claim. *Id.*

that Gonzalez lacked fair notice that it was unlawful to use the City's permit inspection process to intentionally discriminate based on race. *See Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019) ("[T]he salient question is whether the state of the law gave the defendants 'fair warning' that their alleged conduct was unconstitutional." (cleaned up)).

Next, Gonzalez maintains that the grant of summary judgment in his favor should be affirmed, anyway, because no reasonable jury could conclude that he acted as the decisionmaker and so caused Red Door's injuries. But the district court did not reach that issue. Nor is it as straightforward as Gonzalez contends. Notably, Gonzalez's attempt to minimize his role appears to be inconsistent with a construction of the record in the light most favorable to the plaintiffs. We would prefer that the district court address these issues first. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 & n.4 (11th Cir. 2001) (noting our preference for district courts to address issues in the first instance).

Finally, Red Door's briefing does not raise any distinct issue regarding the district court's grant of summary judgment to the City on the § 1983 municipal liability claim. Accordingly, we deem any appeal of that ruling to be abandoned. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (issues not raised on appeal are deemed abandoned).

## V.

In sum, we vacate the grant of summary judgment on Red Door's equal-protection claim against Gonzalez, and we remand

for further proceedings on that claim.  We affirm the remainder of the district court's judgment.

**AFFIRMED in part; VACATED and REMANDED in part.**